832 So.2d 795 (2002)
MCI EXPRESS, INC., Betty Myers, and Donald Kaplan, as Assignee, Appellants,
v.
FORD MOTOR CO. and Ford Motor Credit Co., Appellees.
No. 3D00-3420.
District Court of Appeal of Florida, Third District.
September 30, 2002.
Rehearing and Rehearing Denied December 27, 2002.
*796 Adorno & Zeder, and Raoul G. Cantero, III, Tallahassee, and Natalie J. Carlos, Miami, for appellants.
Carlton Fields, and Wendy F. Lumish, Miami, for appellees.
Before GERSTEN, GREEN and SORONDO, JJ.
Rehearing and Rehearing En Banc Denied December 27, 2002.
PER CURIAM.
MCI Express, Inc. ("MCI"), Betty Myers, individually, and Donald Kaplan, as assignee, appeal the trial court's orders of final judgments in favor of defendants Ford Motor Co. ("Ford") and Ford Motor Credit Co. ("Ford Credit"). We reverse.

FACTS
MCI, a company in the long-haul trucking business, leased forty-six Aeromax A-95 trucks from Ford. The trucks consistently suffered from driveline and vibration problems. MCI reported driveline failures in twenty-one of their trucks, as well as other problems allegedly caused by the vibrations (such as cracks in the windshields, tire wear, etc.). MCI sued Ford and Ford Credit for breach of express and implied warranties, fraud and/or misrepresentation, negligence, and rescission of contract (specifically against Ford Credit). MCI alleged that its trucks suffered from several manufacturing and design defects, that the drivelines would fail and fall off the trucks, and that the driveline malfunctions caused severe vibration, damaging other parts of the vehicles. Ford Credit then filed a counterclaim against MCI, including counts of breach of contract, replevin and wrongful detention.
During the seven-week trial, Ford produced evidence showing that while there had been some problems with the drivelines on the Aeromax trucks, the damages claimed by MCI were not attributed to a design defect but to poor maintenance, abusive driving practices, and outright *797 sabotage. MCI had a high turnover of truck drivers and maintenance workers and often failed to carry insurance on the trucks. Additionally, the company's maintenance records showed large gaps between service on the trucks.
At trial, MCI's counsel brought forth a bag of tape recordings during the testimony of Roy Bray, MCI's CEO. The tapes contained conversations between Bray and the truck lessors regarding the terms of the lease agreements. One of the tapes was inadvertently included and contained conversations between Myers (MCI's president) and Bray. Both Bray and Myers testified that the conversations on that tape occurred several years before MCI leased the Ford trucks. One of the conversations on the tape concerned a vision Bray allegedly had in church of his mother waving at him, which MCI argues places the tape between 1988 and 1989, years before MCI leased the first Ford truck in question.
Ford objected to the introduction of the tapes, as they had not had the opportunity to listen to them. The trial judge and MCI's counsel agreed that the tapes would be marked for identification, but not introduced into evidence at that time, and Ford was given an opportunity to listen to and transcribe them. During the last week of trial, Ford offered the tapes into evidence during its examination of Myers. The one tape inadvertently produced was played in the judge's chambers and the judge ruled that the tape itself would be admitted as an admission against interest.
On the tape, Bray and Myers discuss the possibility of committing insurance fraud. The court excluded this particular conversation as inadmissible character evidence, but admitted the portion of the tape concerning the church vision and a derogatory statement made by Bray regarding his truck drivers. MCI requested that this reference to his drivers as "Goddamn Cubans," be substituted with the word "drivers." MCI argued that any probative value the derogatory, ethnically charged comment might have was outweighed by the prejudice resulting from allowing the jury to hear it since five of the jurors were Hispanic. The court found Bray's opinion of his drivers was relevant to rebut his prior testimony that he had good drivers and refused to redact the phrase from the conversation, allowing the tape, (excluding the insurance fraud conversation), to be played for the jury.
Ford made an edited version of the tape (without the insurance fraud conversation) to send to the jury for its deliberations. Inexplicably, the jury ended up with both the edited and unedited tapes. The court gave a general curative instruction, stating that the tape that the jurors had listened to had been inadvertently delivered and included inadmissible material that should be disregarded and that the court would give them an edited tape to review.
The jury returned a verdict in favor of Ford on all of MCI's claims and in favor of Ford Credit, specifically, for its breach of contract claim against MCI. MCI filed a motion for a new trial, which was denied. The court entered a judgment in Ford's favor and MCI appeals.
MCI contends that the jury's consideration of the excluded conversation regarding insurance fraud and Ford and Ford Credit's exploitation of the "Goddamn Cubans" slur, was so prejudicial that MCI should be granted a new trial. Ford and Ford Credit maintain that MCI did not properly preserve the issue for appellate review, and that the jury's consideration of the inadmissible conversation was not so prejudicial as to warrant a new trial.

ANALYSIS

I. PRESERVATION
The first issue raised on appeal is whether MCI waived its right to a mistrial *798 by coupling the motion for same with a request that the court reserve ruling until after the jury returned a verdict. Upon discovering that the jurors had heard the unedited tape, which included the insurance fraud conversation, MCI's counsel moved for a mistrial. The conversation between MCI's counsel and the trial judge, in pertinent part, went as follows:
MCI's COUNSEL: What I would ask the Court would be whether the Court would
 consider if we did move for a mistrial
THE COURT: If you did?
MCI's COUNSEL: If we did move for a mistrial whether the Court would consider
 reserving ruling on that, allow this Jury go to verdict [sic ], there
 may be a verdict that is satisfactory to the Plaintiff in which case
 this issue would not come up or at least we wouldn't have an issue to
 raise on appeal.
 Absent that, and candidly with the Court, if the Court does not do
 that we would not move for a mistrial just because we cannot afford
 the delay.
 * * * *
MCI's COUNSEL: If you are not going to reserve I will not take a chance moving for a
 mistrial in the event Your Honor will grant it. I am being completely
 straight up.
THE COURT: My inclination is I would not grant a mistrial and I would not take
 under consideration.
MCI's COUNSEL: Would not grant a mistrial?
 * * * *
MCI's COUNSEL: In which case we would move for a mistrial, Your Honor.
THE COURT: Denied.
Ford argues that MCI failed to properly preserve this issue for appeal when it announced it did not want a mistrial and would not ask for one if the court were inclined to grant it before the jury returned a verdict. We disagree.
A motion for mistrial, coupled with a request that the court reserve ruling until the jury returns a verdict does not constitute a waiver. Ed Ricke & Sons, Inc. v. Green By and Through Swan, 468 So.2d 908, 910 (Fla.1985). According to Ford, however, the supreme court's refusal to change the general procedure for a party to preserve a motion requires that there at least be a willingness on the part of the moving party to accept a mistrial. Here, MCI openly admitted that it would not ask for a mistrial if the court would grant it and was only seeking to preserve error. Ford contends that MCI failed to properly follow procedure because instead of coupling the motion for mistrial with a request that the court reserve ruling, MCI merely stated that if the court were inclined to grant the mistrial and would not agree to reserve ruling then it would not move for a mistrial.
Ford analogizes this situation to that in Saxon v. Chacon, 539 So.2d 11 (Fla. 3d DCA 1989), claiming that MCI wanted to take its chances with the jury and could *799 not thereafter move for a mistrial. In Saxon, however, the trial court expressly asked plaintiff's counsel if he wanted to move for a mistrial, indicating that he would be inclined to grant one. Id. at 12. Plaintiff's counsel stated that he would not move for a mistrial "at this time." Id. The facts in the present case are distinguishable, as MCI did not refuse to move for a mistrial, but merely did so on the condition that the trial court reserve ruling until after the jury returned its verdict.
While concern for the need to follow proper procedure to preserve issues for appeal is well founded, there are other important policy considerations. One of the policies driving the Ed Ricke decision was a desire to discourage trial attorneys from deliberately making prejudicial remarks during closing arguments in cases where the outcome was uncertain so as to force the opposing counsel to make a motion for a mistrial. Ed Ricke, 468 So.2d at 910. This concern was reiterated in Ricks v. Loyola, 822 So.2d 502 (Fla.2002), which held that granting trial judges the discretion to wait until after the jury returns a verdict before ruling on a motion for a mistrial will discourage trial attorneys from engaging in such manipulative tactics. Id. at 505. Ricks established that it is within a trial court's discretion "to determine whether it is the best use of judicial resources to let the case go to jury to see if the verdict cures the need for a new trial." Id. at 507. Given the Florida Supreme Court's ruling in Ricks, MCI properly moved for a mistrial and preserved this issue for appellate review.

II. THE TAPE RECORDING
Ford first introduced the tapes into evidence during the testimony of Betty Myers, MCI's President, on September 25, 2000more than six weeks after trial began and just two days before closing arguments commenced. After hearing the tape in chambers, the judge ruled that the tape itself could be admitted into evidence as an admission against interest, but excluded the portion of the tape regarding insurance fraud despite Ford Credit's objection that it was relevant as it related to the conduct of MCI's business affairs.
The trial court correctly excluded the insurance fraud conversation. See Fla. Stat. § 90.404(1) (2000). The jurors, however, heard the unedited tape, including the presumably excised conversation. "It is generally reversible error to deliver to the jury room any materials which have not been admitted into evidence where the materials are of such character as to influence the jury." Sayih v. Perlmutter, 561 So.2d 309, 312 (Fla. 3d DCA 1990); see also Keen v. State, 639 So.2d 597, 599 (Fla.1994) (defendants are entitled to a new trial unless there is no reasonable possibility that the unauthorized materials in the jury room affected the verdict).
Evidence that suggests past criminal conduct is of such a character as to influence a jury, particularly where the credibility of a witness or a party is an important issue. See Fischman v. Suen, 672 So.2d 644, 646 (Fla. 4th DCA 1996) (new trial granted after plaintiff violated an order in limine prohibiting him from mentioning that his former employer had allegedly requested he commit medicare fraud).
In this case, the credibility of MCI's principals was crucial in determining whether they had lied about having experienced drivers and maintaining their vehicles on a regular basis. The excised portion of the tape recording MCI's President and CEO contemplating committing insurance fraud, then, was of such an incriminating nature as to influence the jury. There can be no doubt that the jury's consideration of the unedited tape containing the insurance fraud conversation was highly prejudicial, which was precisely why *800 the trial court excluded it in the first place. See Policari v. Cerbasi, 625 So.2d 998, 999 (Fla. 5th DCA 1993)(new trial warranted where the jurors had seen a newspaper article stating that the plaintiffs' medical witness had been charged with criminal racketeering for insurance fraud).
The trial court erred in admitting any portion of the tape, as it was completely irrelevant to the case and highly prejudicial to MCI. On the tape, Myers and Bray also discuss whether to purchase new or old trucks. Bray tells Myers, "But I just don't see spending no $100,000 to turn loose with a bunch of Goddamn Cubans to beat it to death in a month's time." There was considerable discussion regarding the admissibility of the "Goddamn Cubans" comment. Both Ford and Ford Credit argued that the comment directly contradicted earlier testimony that MCI had good drivers and had never heard of its drivers wrecking the trucks or being inexperienced. Over MCI's objection, the trial judge ultimately accepted Ford's argument that the comment was relevant "because he [Roy Bray] has made a point about saying that they had good drivers and here he is saying that he has drivers that will beat the equipment."
The trial judge's decision to leave the sentence intact instead of replacing the phrase "Goddamn Cubans" with the word "drivers," or even, "Goddamn drivers," rested primarily on his concern that he did not want to be an editor. Despite MCI's repeated objections that any probative value of allowing the comment would be outweighed by the prejudice that would result from having the five Hispanics on the jury hear it, the trial judge decided that "on balance" he was satisfied that Bray was talking about his employees in their capacities as drivers.
Ordinarily, racial slurs and ethnic epithets are so prejudicial as to render them inadmissible, unless the probative value outweighs any prejudice that may result from having the jury hear them. Fla. Stat. § 90.403 (2000); see State v. Gaiter, 616 So.2d 1132, 1133 (Fla. 3d DCA 1993)(trial court did not abuse its discretion in ruling that the probative value of the racial slurs uttered by defendant was substantially outweighed by the danger of unfair prejudice); La Reina Pharmacy, Inc. v. Lopez, 453 So.2d 882, 884 (Fla. 3d DCA 1984)(where plaintiff's credibility was crucial to the trial, her reference to Cubans working at an unemployment office as "scum" had the effect of prejudicing the jury against her); Simmons v. Baptist Hosp. of Miami, Inc., 454 So.2d 681, 682 (Fla. 3d DCA 1984)(where plaintiff's medical witness was subjected to cross-examination which implied that he was a racist who blamed his failure to pass the medical exam on "brown-skinned" foreigners who had more time to study, a new trial was warranted). Inappropriate, highly inflammatory remarks which seek to prejudice the jury against a party, when properly preserved, usually warrant new trials. See McBride v. State, 338 So.2d 567, 568 (Fla. 1st DCA 1976)(trial court abused its discretion in failing to grant motion for mistrial where testimony elicited by prosecutor as to obscene slur allegedly uttered by defendant was undoubtedly offensive to at least two members of the jury).
In this case, MCI objected to the admissibility of the entire tape, and especially to the "Goddamn Cubans" comment. With regards to highly prejudicial and improper remarks, this Court has stated that there is a difference in the way the matter comes to the jury's ears. Stanton v. State, 349 So.2d 761, 765 (Fla. 3d DCA 1977)(finding that while the question implying unethical conduct in "gypsy practice" was highly prejudicial and improper, there was no fundamental error where defense objection had been sustained and there was no request for instruction or mistrial). Here, *801 Ford introduced the tapes into evidence just a few days before the seven-week trial ended. The tape was played for the jury during the testimony of MCI's President. For the jury to actually hear Bray, MCI's CEO, refer to his own employees as "Goddamn Cubans" was highly prejudicial and could only inflame the jurors against MCI. Because the comment, "Goddamn Cubans," could easily have been rephrased without altering the meaning of the sentence, or detracting from its ostensible relevance, any probative value was outweighed by the prejudice that resulted from having the jury hear it. This is particularly so given the way the derogatory remark was exploited by Ford Credit.

III. EXPLOITATION OF THE ETHNIC EPITHET
Over MCI's objection, the trial judge ruled that the "Goddamn Cubans" comment would not be redacted because Bray was talking about his drivers and their mechanical ability to operate the trucks. For the remainder of the trial, however, Ford Credit exploited the phrase "Goddamn Cubans," taking it out of its arguably acceptable context. The tape, excluding the insurance fraud conversation, was played for the jury for the first time during Myers' testimony. During cross-examination, Ford Credit began disparaging the character of MCI's principals:
Q. Miss Myers, is it true that at some time during the course of business of MCI, Mr. Bray told you that his Cuban drivers here in Miami would wreck his trucks within one month's time.
A. Let's distinguish the trucks.
Q. No, let's not. Did he say, yes or no, that your Goddamn Cuban drivers would wreck those trucks within a month's time?
A. He made the statement....
(Emphasis added).
The next day, a husband and a wife were called to the stand by MCI. The husband, Rolando Alvarez, had been a former truck driver for MCI and the wife, Eva Alvarez, was currently employed in the office. Mr. Alvarez testified that he had never heard Bray make a derogatory comment about anyone's race, nationality, sex or religion. Ford Credit's short cross-examination of Mr. Alvarez, however, focused entirely on Bray's use of the phrase "Goddamn Cubans":
Q. I represent Ford Motor Credit.
A. Nice to meet you.
Q. Do you consider the term Goddamn Cuban to be derogatory if somebody said that to you?
A. I believe so.

Q. Me too.

A. You play around sometimes.
Q. I understand but what about if you-well let me ask you, so when you were asked have you ever heard Mr. Bray or Ms. Myers use a derogatory term, if you had heard them refer to their drivers as Goddamn Cubans you would have said yes, I have heard them use derogatory terms?
A. I guess so, but I never heard it.
Q. Never happened?
A. No.
Q. And of course, you don't know whether they referred to their drivers in private as Goddamn Cubans?
A. No, sir.

Ford Credit's counsel: No further questions.
(Emphasis added).
Eva Alvarez was then called to the stand. Ford's cross-examination consisted *802 of a few questions regarding whether she had ever heard MCI's principals use "derogatory comments" in private conversations that would "show a total absolute unequivocal disrespect for certain groups of people." This was the extent of Ford's reference to Bray's use of the phrase "Goddamn Cubans."
Ford Credit, however, again made several references to the "Goddamn Cubans" comment and the cross-examination of Mrs. Alvarez revolved primarily around the derogatory remark:
Q. Are you Cuban?
A. Yes, I am.
* * * *
Q. Did you testify that you never heard either Roy or Betty use derogatory terms towards anyone?
A. No.
Q. You never heard them refer in conversations with each other in a derogatory manner?
A. No.
Q. Do you consider the term Goddamn Cubans a derogatory statement?
A. Yes.

Q. If they were, if in a conversation one of them was referring to the other, in talking to the other referred to MCI's drivers as Goddamn Cubans could you consider that derogatory?
A. Yes.

* * * *
Q. If I played you a tape with a voice on it and Roy Bray is referring to his MCI drivers as Goddamn Cubans, you wouldn't believe it?
A. No, he don't normally have Cubans driving for him.
(Emphasis added).
Ford Credit's blatant exploitation of the phrase "Goddamn Cubans" during cross-examination of the last two witnesses, exacerbated the prejudicial impact of the comment.[1] Ford Credit repeated and highlighted the "Goddamn Cubans" comment, thus painting Bray as a bigot, and by extension MCI as a company owned and run by bigots, rather than using it for its ostensible purpose as a commentary on Bray's opinion of his drivers' mechanical abilities. The blatant exploitation of the ethnically charged comment in front of a jury in which five Hispanics were serving, was highly inflammatory and unfairly prejudicial.

IV. CONCLUSION
We conclude that the trial court abused its discretion in failing to grant MCI's motion for new trial. The jury's consideration of the inadmissible insurance fraud conversation and the ethnic epithet, as well as Ford Credit's exploitation of same were so unfairly prejudicial as to require a new trial.
Accordingly, we reverse and remand the cause for a new trial.
NOTES
[1] We note that the introduction into evidence of a racial or ethnic slur is not per se reversible error. See Jones v. State, 748 So.2d 1012, 1023 (Fla.1999)(where witness indicated that defendant used a racial slur but it was not repeated or subsequently highlighted, it was harmless error, although better practice would have been to omit the statement).