## COMMONWEALTH *vs.* WALTER R. BISHOP.

Plymouth. November 10, 2011. - March 5, 2012.

Present: IRELAND, C.J., SPINA, BOTSFORD, GANTS, & DUFFLY, JJ.

*Practice, Criminal,* Voir dire, Examination of jurors, Voluntariness of state-
ment, Admissions and confessions, Argument by prosecutor, Instructions
to jury, Capital case. *Jury and Jurors. Insanity. Mental Impairment.*

At a murder trial, the judge did not abuse his discretion in limiting the voir dire
of jurors regarding their ability to be fair in applying the law on criminal
responsibility to three questions, where the questions were fair to the prosecu-
tion and the defendant, and adequate to identify prospective jurors who
could not fairly consider the evidence of criminal responsibility or apply the
law to that evidence. [591-593]

At a murder trial, the judge did not err in denying the defendant's motion to
suppress, as involuntary, a portion of a videotaped interrogation (that had
already been the subject of an earlier pretrial motion to suppress), where
the evidence fully supported the judge's implicit finding that the statement
was given voluntarily beyond a reasonable doubt. [593-595]

At a murder trial, the judge did not abuse his discretion in admitting in evi-
dence a comment containing a racial epithet made by the defendant while
he was in jail awaiting trial, and offering to give a limiting instruction,
where the defendant put in issue his criminal responsibility and where the
motive for the killing was unclear. [595-597]

At a murder trial, no substantial likelihood of a miscarriage of justice arose
from certain comments made by the prosecutor during his closing argument,
where the comments were not improper; further, no substantial likelihood of
a miscarriage of justice arose from the prosecutor's improper insinuation
regarding an expert witness for the defendant, where it could be said with
confidence that the jury took the argument with "a grain of salt." [597-599]

At a murder trial, no substantial likelihood of a miscarriage of justice arose
from the judge's error in speaking of mental illness, rather than mental
impairment, in instructing the jury, where, in the absence of testimony dis-
tinguishing a mental impairment from a mental illness, there was no reason
to believe the jury would have been affected in any way had the term
"mental impairment" been substituted for "mental illness" in the instruc-
tion regarding specific intent; further, the judge's inclusion of lack of
mental capacity, as distinguished from mental illness, informed the jury
that they could consider more than mental illness in evaluating evidence of
the defendant's intent. [599-601]

INDICTMENTS found and returned in the Superior Court Depart-
ment on September 23, 2005.

A pretrial motion to suppress evidence was heard by *Joseph M. Walker, III*, J., and the cases were tried before *Charles J. Hely*, J.

*Philip G. Cormier* for the defendant.

*John E. Bradley, Jr.*, Assistant District Attorney, for the Commonwealth.

GANTS, J. On the morning of August 2, 2005, the defendant, Walter R. Bishop, was driving his wife to a train station in Brockton when his Chevrolet Blazer vehicle was blocked on a one-way street by an Isuzu Trooper vehicle, driven by the victim, Sandro Andrade, and he exchanged angry words with the victim. While returning to his home, the defendant saw the Isuzu Trooper parked on Main Street in Brockton. The defendant drove past the vehicle, took a left turn into a parking lot, turned around in the parking lot, and reversed his direction on Main Street. He crossed the solid line and, while driving the wrong way in the north-bound lane of Main Street, struck the rear driver's side door of the Isuzu Trooper as the victim was attempting to remove his young daughter from her car seat. The defendant then put his Blazer in reverse, again struck the rear door of the vehicle, and stopped next to the vehicle. The defendant fired multiple shots through the open driver's side window of his vehicle. One shot grazed the victim's skull but another entered his skull and killed him.

The defendant was indicted for murder in the first degree, in violation of G. L. c. 265, § 1, assault and battery by means of a dangerous weapon, in violation of G. L. c. 265, § 15A (*b*) (where the uninjured child was the alleged victim and the dangerous weapon was the defendant's vehicle), and unlawful possession of a firearm, in violation of G. L. c. 269, § 10 (*a*). At trial, the defendant argued that he was not criminally responsible for the killing. A jury in the Superior Court convicted the defendant of all the indictments.[1]

---

[1]The jury found the defendant guilty of murder in the first degree on a theory of deliberate premeditation; they did not find the defendant guilty of murder in the first degree on a theory of extreme atrocity or cruelty. The defendant was sentenced to life in State prison without the possibility of parole on the murder conviction. He was also sentenced to from five years to five years and one day in State prison on the conviction of assault and battery

The defendant presents five claims on appeal. First, he argues that the judge failed to conduct an appropriate voir dire of the prospective jurors during jury selection regarding their ability to be fair in applying the law regarding criminal responsibility. Second, he claims that his statement to police following his arrest on the day of the killing should have been suppressed because he did not make a knowing and intelligent waiver of his Miranda rights and did not make the statements voluntarily. Third, he claims that the judge erred in admitting a statement the defendant made to another inmate while the defendant was awaiting trial that suggested the defendant held a racial animus. Fourth, he claims that the prosecutor's closing argument was improper and created a substantial risk of a miscarriage of justice. Fifth, the defendant claims that the judge erred when he instructed the jury that they must consider whether the defendant, "as a result of a mental illness, lacked the capacity to have the intent, knowledge, or state of mind necessary" to prove the crimes charged, and should instead have instructed the jury to consider diminished capacity based on mental impairment. Finally, the defendant argues that we should exercise our authority under G. L. c. 278, § 33E, to reduce the murder verdict to murder in the second degree because "it is more consonant with justice." For the reasons detailed below, we affirm the convictions and, after a complete review of the record, decline to exercise our authority under G. L. c. 278, § 33E, to reduce the degree of guilt or order a new trial.

*Background.* Because the defendant does not challenge the sufficiency of the evidence at trial, we briefly summarize it, viewed in the light most favorable to the Commonwealth, reserving certain details for our analysis of the issues raised on appeal.

After striking the victim's vehicle and firing multiple shots at him, the defendant drove south on Main Street and turned right on West Chestnut Street. Based on information regarding the Blazer obtained from witnesses to the incident, the police that same morning traveled to the defendant's home in Brockton,

by means of a dangerous weapon to be served concurrently with the life sentence, and on the conviction of unlawful possession of a firearm, to from four years to five years and one day to be served from and after the sentence on the assault and battery conviction but concurrent with the life sentence.

which was approximately one mile from the scene of the shooting. They saw in the driveway a Blazer that had "fresh damage" on the driver's side, including a paint transfer that appeared to match the color of the Trooper, and a blood spatter on the driver's side rear wheel well. Earlier that morning, at approximately 7:45 A.M., minutes after the shooting, a neighbor of the defendant saw him wiping off the driver's side door of the Blazer.

Police officers asked the defendant to speak with them at the police station, and he agreed. After waiving his Miranda rights and agreeing that the interview could be electronically recorded, the defendant told Brockton Detective Joseph Cummings and State Trooper Diane Lilly that he drove his wife that morning to the train station to catch the 7:37 train to Boston and drove home alone. He said that, when a Brockton police officer came to his house later that morning, he told the police officer that he had guns in his home and that his license to carry had expired. He gave the police officers the keys to his gun cabinet and they looked at his guns.[2] Although he admitted that Detective Cummings had earlier told him that "there was a shooting and they said that my car was involved," he said that he wanted "to know what's going on" and that he had "the feeling that something's wrong, big time." He said, "I don't know what's going on. I'm getting real nervous and real scared."

The defendant denied getting into an accident but did recall that, when he drove by the area across from the car wash, he saw twelve to fourteen people milling outside.[3] When the defendant was told that his vehicle had been involved in a "confrontation" with another vehicle, that paint on his vehicle matched the paint from the victim's vehicle, that there was a shooting in which someone was hurt, and that his vehicle was "involved," he responded by saying, "Shit." When he learned that the victim was dead, he said, "Then I'm up for murder." He admitted that

_____

[2]Later that day, the State police executed a search warrant at the defendant's residence, where they seized a .32 caliber semiautomatic handgun. A ballistics expert testified that a cartridge casing found at the crime scene was of the same caliber and could have been fired from this weapon, but there were insufficient markings to permit him to reach a conclusion as to whether the cartridge was fired from that firearm.

[3]There was a car wash directly across the street from the scene of the shooting.

he had been the person driving his vehicle that morning and denied that he had blacked out.

Neither the defendant nor his wife testified at trial, but both spoke with the defense psychiatrists as to what happened on the day of the shooting, and one of the defense psychiatrists, Dr. Roger Gray, testified to what they had told him.[4] According to them, the defendant was driving his wife to the train station when the victim blocked their vehicle by backing up in his vehicle on a one-way street. They shouted at each other, and the victim made threatening statements and "shook his finger as if he had a gun."[5] The defendant's wife was terrified and screamed at the defendant to "get me the heck out of here." The defendant turned the corner "on two wheels" and reached the train station on time. Although the defendant's wife usually waited with the defendant in the car until her train arrived at the station, she was apparently so angry with the defendant and so terrified of him "that she just got out of the car and said, 'Get away from me.' "

Dr. Ronald Winfield and Dr. Gray both testified for the defense about the defendant's mental health. Dr. Winfield testified that ten years before the incident the defendant had been diagnosed with posttraumatic stress syndrome (PTSS) and a major depressive disorder. Dr. Winfield believed the defendant to have a depressive disorder but did not think that the defendant met the medical criteria for either PTSS or major depressive disorder. He also testified that the defendant suffered from chronic obstructive pulmonary disease (COPD), a medical condition that interferes with blood flow to the brain and can interrupt thought

---

[4]No instruction limiting the use of this testimony to the jury's evaluation of the psychiatrists' opinions regarding criminal responsibility was requested or provided, so the testimony was admitted without restriction. See *Commonwealth v. Gil*, 393 Mass. 204, 220 (1984), and cases cited. The defendant on request was entitled to such an instruction, see *Commonwealth v. Rutkowski*, 459 Mass. 794, 800 (2011), but the defendant does not contend (and we do not conclude) that defense counsel was ineffective for failing to request such a limiting instruction. Testimony offered for its truth describing the events leading up to the killing was essential to the defendant's claim of lack of criminal responsibility, and defense counsel succeeded in presenting the defendant's and his wife's version of this truth without subjecting them to cross-examination.

[5]According to Dr. Roger Gray, the defendant said that the victim threatened, "I'm going to get you, I'm going to get your family, I know where you live."

processes and the ability to maintain control. To treat the symptoms of COPD the defendant was taking prednisone, a steroid whose side effects can include anxiety, depression, and confusion. Dr. Winfield concluded that on the day of the killing the defendant suffered from an "impulse control disorder not otherwise specified," which combined with other factors — the defendant's COPD and its consequences, which included "paranoid ideation with a tendency to over-perceive threat," "acute stress" arising from the "threatening situation" with the victim, nicotine withdrawal, and "prednisone-induced disturbance" — made him unable to conform his behavior to the requirements of the law.

Dr. Gray also offered the opinion that the defendant could not conform his behavior to the requirements of the law at the time of the shooting based on a confluence of factors that included an impulse control disorder, COPD, depression, an anxiety disorder, panic disorder, and the various medications he was taking. He also testified that at the time of the shooting the defendant had a genuine belief that his family was in danger of being killed by the victim that overrode his capacity to think rationally.

In rebuttal, the Commonwealth called another psychiatrist, Dr. Russell Vasile, who offered the opinion that the defendant did not suffer from any mental disease or defect, and therefore was criminally responsible for his actions at the time of the shooting.[6] Dr. Vasile found no evidence in the record to support a diagnosis of a psychotic disorder, a major depression, paranoid delusions, intermittent explosive disorder, or impulse control disorder, not otherwise specified. He also testified that violent behavior is not typically associated with impulse control disorder, not otherwise specified, and that the examples in the Diagnostic and Statistical Manual of Mental Disorders (4th ed.) of behavior consistent with this disorder include skin picking, delicate self-cutting, picking at nails, and compulsive shopping.

*Discussion.* We review each of the defendant's claims of error.

1. *Voir dire of the jury venire.* Before trial, the defendant submitted a list of eighteen voir dire questions that he wanted

---

[6]Dr. Russell Vasile initially testified that the defendant did not suffer from "a major mental disease or defect," but clarified on cross-examination that the defendant did not suffer from any mental disease or defect.

the judge to ask of prospective jurors regarding the issue of criminal responsibility. The judge agreed to conduct an individual voir dire on the issue of criminal responsibility in which he would ask each prospective juror three questions that he drafted regarding their ability fairly to consider the issue of criminal responsibility, which he described as the issue of "insanity." The defendant argued that the judge's questions did not go far enough in addressing the issue of criminal responsibility, but he did not object to the judge's proposed questions. During voir dire the judge asked each prospective juror at sidebar the following three questions:

"[1] There may be evidence on a possible issue of insanity. If there is evidence on the issue of insanity the burden of proof is on the Commonwealth. Is there any reason that prevents you from considering all the evidence in a fair and open-minded way, including evidence on both sides of an insanity issue?

"[2] Do you have any prejudgment about insanity or any opinion that would prevent you from finding the defendant not guilty by insanity if the evidence fails to prove he was sane?

"[3] Do you have any prejudgment or opinion about insanity that would prevent you from finding him guilty if the Commonwealth proved that the defendant committed the offense and that he was not insane?"

Of the prospective jurors, two indicated that they might have opinions that would prevent them from finding the defendant not guilty if they found that he committed the offense but the Commonwealth failed to prove that he was criminally responsible, and both were excused for cause. A third prospective juror was excused for cause after she demonstrated that she did not understand the issue of criminal responsibility.

The defendant now argues that the judge's voir dire questions were insufficient to guarantee his constitutional right to a trial by an impartial jury because the "closed-ended questions were wholly inadequate to accurately ferret out juror bias against the insanity defense." In *Commonwealth* v. *Seguin*, 421 Mass. 243, 248 (1995) (*Seguin*), we noted that "a considerable proportion of

randomly selected people reject or are at least skeptical of the concept" that a defendant who committed a crime must be found not guilty if the Commonwealth fails to meet its burden of proving criminal responsibility. For that reason, we held that on a defendant's request "the judge shall inquire individually of each potential juror, in some manner, whether the juror has any opinion that would prevent him or her from returning a verdict of not guilty by reason of insanity." *Id.* at 249. In *Seguin, supra* at 246, the judge asked each juror a single question:

> "The Commonwealth has the burden of proving beyond a reasonable doubt that this defendant was both guilty of the alleged crime and was criminally responsible; that is, legally sane. If the Commonwealth fails in its burden to prove he was legally sane, have you any opinions that would prevent you from returning a verdict of not guilty by reason of insanity?"

We held that there was no basis to conclude that further inquiry as to this issue "would have prompted a change of mind by any juror who unhesitatingly had stated a willingness to return a verdict of not guilty by reason of insanity if the Commonwealth failed to meet its burden of proof." *Id.* at 247-248.

Here, the judge's second question was similar in substance to the voir dire question asked in *Seguin.* In addition, the judge asked each prospective juror whether he or she could consider all the evidence on the issue of criminal responsibility "in a fair and open-minded way," and whether the prospective juror had any opinion that would prevent the juror from finding the defendant guilty if the Commonwealth met its burden of proving criminal responsibility. The voir dire questions were fair to the prosecution and the defendant, and adequate to identify prospective jurors who could not fairly consider the evidence of criminal responsibility or apply the law to that evidence. The judge did not abuse his discretion in limiting the voir dire to these questions. See *id.* at 247.[7]

2. *Motion to suppress.* Before trial, the defendant moved to

---

[7]A judge, of course, retains the discretion to ask more detailed or more open-ended questions on the issue of criminal responsibility during individual voir dire. See *Commonwealth* v. *Seguin,* 421 Mass. 243, 249 (1995).

suppress the videotaped statements he made at the police station during his interrogation on the morning of the killing. The Commonwealth agreed to limit the statements offered in evidence to those made by the defendant before he said, "I want to shut up." The defendant appeared to consider that a satisfactory resolution of the motion and did not object when the motion judge (who was not the trial judge) allowed the motion to the extent of the parties' agreement. At trial, however, just before Trooper Lilly was to testify to the defendant's preinvocation statements on August 2, 2005, and offer in evidence the redacted videotape of the interview, the defendant orally moved to suppress the statement at an earlier point than had been agreed to, claiming that the defendant invoked his right to silence when he said, "I don't know what's going on. I'm getting real nervous and real scared."[8] The judge denied the motion to exclude these additional statements. The defendant then orally moved to suppress the entire interrogation on the ground that the defendant's voluntariness was a "live issue." The judge denied the defendant's motion to suppress the statement as involuntary but provided a humane practice instruction in his charge to the jury at the close of the case that told the jury they must find the statement voluntary beyond a reasonable doubt before they could consider it.

The judge did not err in denying these belated defense motions. It is plain from the videotape recording of the interrogation that the defendant knowingly and intelligently waived his Miranda rights, and signed the Miranda waiver. Detective Cummings and Trooper Lilly explained each of his Miranda rights to him and, after reading each right, asked him if he understood, which he said he did. When asked if he wanted to waive his rights and speak with the detective and trooper, he answered, "I guess so," and paused before signing the written Miranda waiver, but this hesitation suggests only the defendant's recognition of the weight of this decision; it does not suggest that his ultimate waiver was not knowing or intelligent. The defendant himself

---

[8] A transcript was made of the videotaped interrogation and admitted in evidence. Under the agreement entered into before trial, the jury would receive the first nineteen pages of the transcript; the defendant requested during trial that they receive only the first twelve pages.

had been a public housing police officer, so he was familiar with the Miranda protocol and the consequences of waiver.[9]

Nor is there anything in the videotaped interrogation to suggest that the defendant's statements were not voluntary. The questioning of the defendant was performed calmly and in a conversational tone. When the defendant said he was nervous and was starting to choke up, Detective Cummings invited him to use the medication he takes when that occurs and to "[r]elax as much as you can." At all times during the interrogation, the defendant seemed to understand the questions asked of him and gave clear answers. When Detective Cummings asked him to go through his day, the defendant replied, "Well, I think the main fact that you're interested in is what happened, you know, from to and from the station." This statement indicates that the defendant understood why he was being questioned, and what information the officers sought. The defendant went on to state what he had done that morning in great detail, including the exact time he woke up in the morning and the time of his wife's train. The defendant gave a street-by-street narration of his route to and from the train station that morning. When asked if he takes medication, the defendant identified eight medications and the ailment treated by each medication. The evidence fully supports the judge's implicit finding that the statement was given voluntarily beyond a reasonable doubt.

3. *Jail statement.* The defendant moved before trial to exclude a comment he made while he was in jail awaiting trial that suggested racial animus. The judge reserved his ruling, forbade any mention of the comment in the prosecutor's opening statement, and conducted an evidentiary hearing during trial. At the hearing, Sergeant Paul Greenwood of the Plymouth County sheriff's

---

[9]The defendant on appeal does not challenge the judge's denial of his claim of an earlier invocation of silence. We have nonetheless considered this issue as part of our plenary review under G. L. c. 278, § 33E, and conclude that, where as here the defendant had previously made a knowing and intelligent waiver of his Miranda rights, his statement that, "I don't know what's going on. I'm getting real nervous and real scared," does not state with sufficient clarity an invocation of his right to silence. See, e.g., *Commonwealth* v. *Clarke, ante* 336, 349 (2012) ("our case law recognizes that it makes sense to expect heightened clarity from a suspect who wants to change course and cease interrogation after having already indicated a desire to continue questioning").

department testified that on June 23, 2006, the defendant, who was now confined to a wheel chair, was with six other inmates in the garage of the Plymouth County jail waiting to be transported. One of the inmates, a black male in his thirties, was screaming at the defendant and another person, calling them "PC," a reference to prisoners being held in protective custody. The defendant shook his head sideways several times and had "a slight smirk on his face." The defendant turned to the inmate and said, "Watch out, I'm in here for shooting a nigger."

The judge denied the motion to exclude the evidence, finding that it was an admission by the defendant that he committed the shooting. The judge invited counsel to request a limiting instruction to address the inflammatory nature of the racial slur; the defendant objected to the admission of the evidence but asked that no instruction be given. In his closing argument, the prosecutor argued that the defendant's statement in jail "tells you . . . that he knew full well what he did. And I suggest to you it also clearly shows a racial animus . . . ." The defendant did not object to the prosecutor's reference to this statement in closing argument.

We review a judge's decision whether the probative value of evidence is substantially outweighed by the danger of unfair prejudice under the abuse of discretion standard. *Commonwealth v. Pytou Heang*, 458 Mass. 827, 851-852 (2011). We recognize that the use of the word "nigger," especially when directed by a white man toward an African-American man, poses a risk of inflaming a jury's emotions matched by few other words. See *Commonwealth v. Mahdi*, 388 Mass. 679, 693 (1983) ("References [in closing argument] to race or national origin principally to inflame jurors or appeal to their racial or ethnic prejudices or fears constitute prosecutorial misconduct"); *MCI Express, Inc. v. Ford Motor Co.*, 832 So. 2d 795, 800 (Fla. Dist. Ct. App. 2002) ("Ordinarily, racial slurs and ethnic epithets are so prejudicial as to render them inadmissible, unless the probative value outweighs any prejudice that may result from having the jury hear them"). Therefore, before a judge admits evidence that a defendant used this word to describe a man of color, the judge must be convinced that the probative weight of such evidence justifies this risk. As the prosecutor suggested in his closing argument, the defendant's

statement permits the inference that the defendant intended the killing, and that the rage that triggered it arose, at least in part, from the defendant's animus toward the victim's race.[10] Where, as here, the defendant has put in issue his criminal responsibility and where the motive for the defendant's killing is unclear, we conclude that the judge did not abuse his discretion by admitting this evidence and offering the defendant a limiting instruction to address the risk that it will be misused by the jury.[11]

4. *Commonwealth's closing argument.* The defendant argues that the prosecutor made three improper assertions in his closing argument that require reversal. "As the defendant did not object at trial to any of the aspects of the prosecutor's closing that he now challenges, . . . we review his claims to determine whether a substantial likelihood of a miscarriage of justice exists." *Commonwealth* v. *Miller*, 457 Mass. 69, 76 (2010).

First, the defendant contends that it was improper for the prosecutor to declare that, on the day of the killing, the victim was "basically being a good guy." The prosecutor made this statement while explaining what the victim was doing in the hour preceding the crime: giving his cousin and another acquaintance rides to work and showing off his child to some friends. No reasonable jury would have understood this remark to suggest that the prosecutor was vouching for the victim's character, especially where there was no issue of self-defense.

Second, the defendant argues that it was improper for the prosecutor to argue that the defendant's postarrest statement reflects racial animus. We have already stated that racial animus was a permissible inference from the defendant's use of such a racially charged word, albeit not the only permissible inference.

Finally, the defendant contends that the prosecutor improperly

---

[10]We also recognize, as the defendant notes, that there are alternative inferences that carry no probative weight: the defendant may have sought simply to frighten the African-American inmate to prevent the harassment and demonstrate that he was not as helpless as he may appear in his wheelchair.

[11]The only reason we can discern from the record for the defendant's refusal of a limiting instruction is defense counsel's declaration that the judge's decision to admit this evidence constituted reversible error and "the less said about it the better." Where the admission of evidence would not be an abuse of discretion with a limiting instruction, it cannot become an abuse of discretion because the defendant refused the limiting instruction.

disparaged the defendant's expert witnesses by suggesting that they were attempting to trick or confuse the jury, and by arguing that the experts' testimony had been "bought" by the defense. The prosecutor stated:

> "What I suggest [the defense psychiatrists] did, ladies and gentlemen, with all due respect, was that they threw a bunch of stuff at you hoping that something would stick. What did they ultimately say to you? They mentioned a lot. They mentioned a lot of fancy psychiatric terms, used a lot of jargon and vernacular, PPSD [*sic*], disassociation, major depression. . . . They tried to throw a bunch of stuff at you, baffling you with a bunch of psychiatric jargon . . . . That's the best they could do ladies and gentlemen. And they want to pass that off as a mental disease or defect that would absolve this defendant of his actions?"

The prosecutor also said that "one of the defense doctors billed at a rate of $250 bucks an hour. And it so happens that he's able to come up with something that's helpful to the defense."

The prosecutor's argument regarding the defense psychiatrists' jargon was fair comment on their testimony, where they declared that the defendant had symptoms of various mental diseases, including posttraumatic stress syndrome and intermittent explosive disorder, but ultimately concluded that he did not meet the criteria for these diagnoses. The prosecutor's argument regarding Dr. Gray's billing rate, however, was not fair comment. Evidence of an expert's billing rate is admissible as evidence of bias, and it is appropriate to remind the jury that an expert was retained by the defendant. See *Commonwealth* v. *O'Brien*, 377 Mass. 772, 778 (1979); *Dempsey* v. *Goldstein Bros. Amusement Co.*, 231 Mass. 461, 464-465 (1919). But it is improper for a prosecutor to suggest that an expert witness's testimony was "bought" by a defendant or to characterize the witness as a "hired gun" where, as here, there was no evidence that he was paid more than his customary fee. *Commonwealth* v. *Shelley*, 374 Mass. 466, 469-470 (1978), *S.C.*, 381 Mass. 340 (1980). See *Commonwealth* v. *O'Brien, supra* at 777-778. The prosecutor here crossed the line between appropriate argument and improper insinuation, but we are confident that the jury took "the criticized argument with a 'grain of salt,' " *Commonwealth* v. *Benson*, 419 Mass. 114, 120

(1994), quoting *Commonwealth* v. *Wallace*, 417 Mass. 126, 134 (1994), and conclude that it did not create a substantial likelihood of a miscarriage of justice.

5. *Jury instruction.* Finally, the defendant argues that the judge erred by instructing the jury that they must consider evidence of mental illness, rather than mental impairment, in deciding whether the defendant had the intent required for the offenses charged. After instructing the jury regarding the issue of criminal responsibility, the judge declared that, if the jury were to find the defendant to be criminally responsible, they "must also consider whether the defendant, as a result of mental illness, lacked the capacity to have the intent, knowledge, or state of mind necessary" for the crimes they were considering. He added, "You must consider all the evidence, including any evidence of mental illness and mental capacity, or lack of capacity, in determining whether the Commonwealth has proved beyond a reasonable doubt that the defendant had the intent, knowledge, and state of mind elements required for each particular form of murder being considered." The defendant objected to the instruction, noting that "diminished capacity does not require illness." He did not, however, ask the judge to use the term "mental impairment" but, instead, asked the judge to add "or didn't have the mental capacity," which the judge in substance had already included in his instruction.

Where there is evidence of the defendant's mental impairment at the time of the crime, he is entitled to an instruction requiring the jury to consider that mental impairment in deciding whether the Commonwealth has proved specific intent. See *Commonwealth* v. *Grey*, 399 Mass. 469, 470-471 (1987) ("Just as we permit evidence of a defendant's alleged intoxication to be considered when his specific intent to kill is in issue, . . . we should permit the jury to consider evidence of mental impairment at the time of the crime in deciding whether the Commonwealth has proved the defendant's specific intent"); Massachusetts Superior Court Criminal Practice Jury Instructions § 2.11.6 (Mass. Continuing Legal Educ. 1999 & 1st Supp. 2003) ("Whenever the Commonwealth must prove the defendant's intention to do something, you should consider any credible evidence of [mental impairment] [the effect on the defendant of his consump-

tion of (alcohol) (drugs) (alcohol and other drugs)] in determining whether the Commonwealth has met its burden of proof'").

The distinction between a mental disease or defect and a mental impairment is so elusive that we, too, have conflated the two terms. In *Commonwealth* v. *Urrea*, 443 Mass. 530, 535 (2005), we noted:

> "[T]he mental impairment defense allows a defendant to argue that an abnormal mental condition negates his capacity to form a specific intent or his ability to make a decision in a normal manner. When the defense is one of impairment of mental processes, the issue is whether, as a result of a mental disease or defect, the defendant lacked substantial mental capacity to engage in deliberate premeditation."

See *Commonwealth* v. *Gould*, 380 Mass. 672, 683 (1980) (where expert testimony is elicited regarding defendant's capacity for intent, planning, and premeditation, "then the judge should instruct the jury that the defendant's mental illness may be considered on the issue of deliberate premeditation").

We recognize the possibility that a defendant may have a mental impairment that could affect his ability to premeditate or form a specific intent without also having a mental illness, and therefore conclude that it is error for the judge to have spoken of mental illness rather than mental impairment in this context. See *Commonwealth* v. *LaCava*, 438 Mass. 708, 717 (2003) (element of malice "may be negated by showing a lack of specific intent due to mental impairment"); Massachusetts Superior Court Criminal Practice Jury Instructions, *supra.* See also *Commonwealth* v. *Rutkowski*, 459 Mass. 794, 795 (2011) (failure to instruct jury on ability to consider mental impairment as to question of extreme atrocity or cruelty required new trial). But we conclude that, even if the defendant's objection had adequately preserved the issue, the error was not prejudicial in the circumstances of this case because we are convinced that it "did not influence the jury, or had but very slight effect." *Commonwealth* v. *Christian*, 430 Mass. 552, 563 (2000), quoting *Commonwealth* v. *Flebotte*, 417 Mass. 348, 353 (1994). None of the testifying psychiatrists used the term "mental impairment" during their trial

testimony, so there was no evidence that the defendant suffered from a mental impairment apart from a mental illness. Without testimony distinguishing a mental impairment from a mental illness, there is no reason to believe that the jury would have been affected in any way had "mental impairment" been substituted for "mental illness" in the judge's instruction regarding specific intent. Moreover, the judge's inclusion of lack of mental capacity, as distinguished from mental illness, informed the jury that they could consider more than mental illness in evaluating the evidence regarding the defendant's intent.

*Conclusion.* None of the defendant's claims on appeal warrants reversal of the convictions. We also have reviewed the entire trial record pursuant to G. L. c. 278, § 33E, including the videotaped interview of the defendant, and conclude that the interests of justice do not require the reduction of the murder conviction to a lesser degree of guilt or a new trial.

*Judgments affirmed.*