Commonwealth v. Santos.

COMMONWEALTH vs. SCOTTY SANTOS
(and a companion case[1]).

Suffolk. March 8, 2011. - July 12, 2011.

Present: IRELAND, C.J., SPINA, CORDY, BOTSFORD, GANTS, & DUFFLY, JJ.

*Disturbing the Peace. Assault and Battery on Certain Public Officers and Employees. Resisting Arrest. Evidence, Hearsay, Relevancy and materiality. Practice, Criminal, Hearsay, Harmless error. Error, Harmless.*

This court concluded that where, at the trial of a criminal complaint charging the defendants with disturbing the peace and assault and battery on a police officer, the exclusion of testimony regarding statements by the officers was error in that the statements (which were not offered for their truth) were not hearsay, the appropriate standard of review was whether the exclusion prejudiced the defendants. [136-137]

At the trial of a criminal complaint charging the defendants with disturbing the peace and assault and battery on a police officer, the erroneous exclusion of testimony regarding statements by the officers constituted prejudicial error requiring reversal of the defendants' convictions, where the exclusion of the statements may have had a substantial impact on the jury's assessment of witnesses critical to the defense, given that the case turned entirely on witness credibility. [137-138]

COMPLAINTS received and sworn to in the Dorchester Division of the Boston Municipal Court Department on April 14, 2006.

After transfer to the Central Division of the Boston Municipal Court Department, the cases were tried before *Michael J. Coyne,* J.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Kathryn Karczewska Ohren* for Jonathan Pena Santos.

*Christine K. Tramontana* for Scotty Santos.

*David D. McGowan,* Assistant District Attorney (*Michael J. Callahan,* Assistant District Attorney, with him) for the Commonwealth.

[1]Commonwealth *vs.* Jonathan Pena Santos.

CORDY, J. In the late evening of April 13 and into the early morning hours of April 14, 2006, an encounter between police and several residents and their guests, in front of a home on Levant Street in the Dorchester section of Boston, erupted into an altercation and the arrest of four men on a number of charges. After a seven-day jury trial, the defendants Scotty Santos (Scotty) and his brother, Jonathan Pena Santos (Jonathan), were convicted of disturbing the peace, G. L. c. 272, § 53.[2] Scotty was also convicted of two counts of assault and battery on a police officer,[3] G. L. c. 265, § 13D, and resisting arrest, G. L. c. 268, § 32B.[4,5]

During the trial, the defendants proposed to introduce in evidence statements they alleged were made by police officers during the events that led to the arrests, and that escalated the encounter in front of their home into a public disturbance. The statements were offered through the testimony of Scotty and two percipient witnesses. They included racial slurs, threats of violence, and vulgarity. Initially, the judge excluded the statements as inadmissible hearsay. Later in the trial, he allowed Scotty to testify to the content of statements made by the only police officer that he was able to identify. The other witnesses were not allowed to testify about what they heard the officers say.

In an unpublished memorandum and order pursuant to its

[2]Jonathan Pena Santos (Jonathan) was found not guilty of assault and battery on a police officer, G. L. c. 265, § 13D; and resisting arrest, G. L. c. 268, § 32B. The Commonwealth filed a nolle prosequi on a charge of aiding escape from a police officer, G. L. c. 268, § 17.

[3]These two counts charged assault and battery on Officers Henry Araica and Edward Barrett of the Boston police department.

[4]Scotty Santos (Scotty) was found not guilty of two counts of assault and battery on a police officer (Officers Richard Medina and Timothy Hancock), and attempting to commit a crime, G. L. c. 274, § 6. The Commonwealth filed a nolle prosequi on a charge of aiding escape from a police officer.

[5]Malikkquann Wilson (Malikkquann) and Wayne Wilson (Wayne) were tried as codefendants. Wayne was found not guilty of the charges against him, assault and battery on a police officer, and resisting arrest. Malikkquann was found not guilty of carrying a firearm without a license, G. L. c. 269, § 10 (a); an enhanced penalty for carrying a loaded weapon, G. L. c. 269, § 10 (n); possession of firearm without a firearm identification card, G. L. c. 269, § 10 (h) (1); G. L. c. 140, § 129B (6); assault and battery on a police officer; and drinking an alcoholic beverage in a public place, G. L. c. 272, § 59. Malikkquann was found guilty of resisting arrest.

rule 1:28, the Appeals Court held the exclusion of these state-
ments to be error, but concluded that the error was harmless and
affirmed the convictions. *Commonwealth* v. *Santos*, 76 Mass.
App. Ct. 1123 (2010). We granted the defendants' applications
for further appellate review. The Commonwealth concedes that
the statements were not being offered for their truth and it was
error to exclude them as hearsay. The issue is the appropriate
standard of review to apply to the error. For the reasons that
follow, we conclude that the exclusion of the statements did not
rise to the level of constitutional error and is properly reviewed
under the prejudicial error standard.[6] See *Commonwealth* v. *Fle-
botte*, 417 Mass. 348, 353 (1994). In our view, the error was
prejudicial, and we reverse the defendants' convictions.

1. *The trial.* The testimony at trial was conflicting in major
respects. It is summarized below from the trial record and the
parties' joint motion nunc pro tunc to settle the record on appeal.[7]

a. *The Commonwealth's case.* The Commonwealth's account
of the events was presented through the testimony of Boston
police Sergeant Keith Dalrymple and Officers Christopher Ross,
Richard Medina, James Galvin, Henry Araica, Edward Barrett,
and Timothy Hancock. On April 13, Officers Ross and Medina
were patrolling Levant Street in plain clothes and an unmarked
police vehicle shortly before midnight. Officer Ross testified
that this area of Dorchester is a particularly violent one in
which he had made approximately sixty firearms arrests in his
nine years as a police officer.

Around 12:15 A.M. (April 14), Officers Ross and Medina
observed six or seven individuals drinking beer on the sidewalk

---

[6]In its brief, the Commonwealth argues that Jonathan did not object to the
exclusion of the officers' statements when offered by Paula Fortes or Scotty,
and therefore, the standard of review to be applied in Jonathan's case is
whether the error created a substantial risk of a miscarriage of justice. However,
as is made clear in Jonathan's reply brief, the Commonwealth stipulated to the
objections made by defense counsel at trial in its joint motion nunc pro tunc
to settle the record on appeal. The error is therefore treated as preserved.

[7]Due to faulty court room recording equipment, the transcript of the trial
contains a number of inaudible comments and breaks, mostly during the com-
ments made at sidebar and during closing arguments. The parties filed the
joint motion in order to fill in the missing portions, most of which relate to
the attempted proffer of evidence relating to the statements made by the offic-
ers and the prosecutor's closing argument.

in front of 6 Levant Street and pulled up to the house. The officers observed one individual, Malikkquann Wilson (Malikkquann), put his right hand on his waistband and turn and walk up the steps to the front porch of 6 Levant Street, a three-family building where Scotty and Jonathan lived. The officers became concerned that Malikkquann was concealing a firearm, and Officer Ross got out of the unmarked vehicle and followed him up the steps. At the top step of the porch, Officer Ross was met by Scotty, who put himself between Officer Ross and Malikkquann and told Officer Ross to "get the fuck off the porch, bitch." Malikkquann then walked between Scotty and Officer Ross, bumping Officer Ross in the chest, and walked back down the steps to the curb.

Officer Medina, who had also stepped out of the vehicle, then attempted to detain Malikkquann, but Wayne Wilson (Wayne), Malikkquann's brother, and Jonathan blocked Officer Medina and pushed him back to the street. Officer Medina was able to grab Malikkquann's arm and turned his body, revealing a firearm in his hand. Officer Ross then heard Officer Medina say, "He's got a gun, he's got a gun." Officer Medina was again pushed by Jonathan to prevent him from detaining Malikkquann. Officer Medina attempted to pursue Malikkquann, but Wayne and Scotty pushed him off his path. Malikkquann ran by Officer Ross, who observed a silver firearm in Malikkquann's hand. Officer Ross chased Malikkquann down the side of the house and saw him throw the gun over a fence. Malikkquann was apprehended and arrested, and a loaded Ruger .45 caliber pistol was recovered.

Meanwhile, Officer Medina ordered Wayne, Scotty, and Jonathan down to the ground. Wayne complied, but Jonathan and Scotty refused and walked into their house. Wayne then got up from the ground and began walking down the street.[8] Officer Medina remained where he was to ensure that no one picked up the gun thrown by Malikkquann.

As other officers arrived on the scene, including Sergeant Keith Dalrymple, Scotty and Jonathan emerged from the second floor of the home on 6 Levant Street and began yelling at the police officers from the porch. Officer Ross testified that Scotty

---

[8]Wayne was arrested by Officer Medina approximately thirty minutes later near Geneva Avenue.

and Jonathan were yelling, "Fucking pigs . . . get off our street," and, "Fuck you, you can't make us do shit; come up, we'll bang with you." Officer Ross also testified that Scotty and Jonathan were told to go inside the house and "call it a night."[9] The yelling from Scotty and Jonathan went on for approximately twenty minutes, and a small crowd gathered at the end of Levant Street. Only Officer Medina admitted using profanity, testifying that he possibly could have used " 'F' bombs." Officer Medina testified that Sergeant Dalrymple instructed Scotty and Jonathan to come down to be arrested, but they did not come down. At that point, Sergeant Dalrymple told the officers to go into the house to arrest Scotty and Jonathan.

The officers forced open the door to 6 Levant Street and entered the house. Scotty and Jonathan were on the third-floor landing of the back stairway, yelling for the officers to come up; when the officers came up, the brothers were in "fighting positions." The officers apprehended Jonathan without incident and handcuffed him. Scotty struggled as Officers Araica and Barrett tried to detain him. During the struggle, Officer Barrett felt Scotty's hand on his firearm briefly. He warned the other officers that Scotty had his firearm, even though Scotty never took possession of it. Officer Barrett then struck Scotty across the nose with his flashlight at least twice. Officer Hancock also struck Scotty on the back of the head with his flashlight. Scotty came out of the house bleeding from the head and was taken to a police station.

b. *The defense case.* The defendants' account of events was presented through the testimony of Scotty; Alectre Tavares (Alectre), who was present on the night in question; and Paula Fortes, the defendants' upstairs neighbor.

i. *Scotty's testimony.* Scotty testified that on the evening of April 13, 2006, he came home from work around 11 P.M. and saw a group of people outside his house celebrating with Alectre, a life-long friend and soldier in the United States Army, who was nearing the end of his leave from the fighting in Iraq. Some of them were sitting on the porch. He said hello to everyone gathered and walked up the steps of the porch with the

---

[9]A photograph was admitted in evidence that showed Jonathan "giving . . . the finger" to the officers below.

intention of going inside. Before he could open the front door, he was pushed from behind by someone, whom he told to get off of his property. When he turned around, he saw the person who pushed him was Officer Ross (in plain clothes), who said that he wanted to speak to the other people on the porch. There was a commotion as people tried to get off the porch. When they left, Scotty went down the steps and closed the gate behind them. He then located his brother Jonathan, and they went inside the house and to their respective rooms. A short time later, Scotty heard yelling back and forth and went out onto the second-floor porch of Jonathan's room (overlooking Levant Street), where Jonathan was arguing with the police who were down in the street. About "ten cop cars" with flashing lights were now in the area.

Defense counsel then attempted to elicit testimony from Scotty concerning what he heard the police officers yelling at Jonathan, but the judge would not allow the testimony, ruling that it was hearsay. Scotty testified that at some point he saw police officers run into the house, which prompted both him and Jonathan to run to the back stairwell of the house to hide. Several police officers, however, came up the back stairwell, and one officer grabbed Jonathan, put him down on the ground, and handcuffed him.

Scotty testified that Officer Araica then grabbed him by the neck and tried to throw him down, but Scotty held onto the railing of the stairway. Officer Araica and Scotty struggled, and Officer Robert Connolly struck Scotty in the head repeatedly. While Scotty struggled to remove Officer Araica's hands from around his neck, Scotty's hand brushed Officer Araica's waist. Officer Araica then yelled, "He has my gun," and Scotty was hit repeatedly in the head with a flashlight as he protested, "I don't have your gun." Scotty fell to one knee and put his hands up to be handcuffed. After he was handcuffed, an officer continued to hit him in the back. The officers then dragged Scotty headfirst down the steps. Once at the bottom of the steps, Officer Araica and another officer led Scotty out of the house and into the police van. Scotty testified that he could not see as he came out of the house because there was blood in his eyes.

After this testimony, defense counsel again attempted to elicit

testimony from Scotty regarding what the officers were yelling while Scotty and Jonathan were standing on the second-floor porch. The judge again denied the request on hearsay grounds.

On examination of Scotty by counsel for Wayne, a further attempt was made to introduce the substance of what the officers were shouting as evidence of their "present intention." The judge sustained the prosecutor's objections to the questions, eventually ruling that Scotty could testify only to statements made by officers he could specifically identify. Scotty testified that there were about twelve police officers in the street "saying their little things," but could not identify them more particularly except that one was a "black cop" with a "beard" and another was a "heavy set" black man. He was not permitted to testify further at this point.

During cross-examination by the prosecutor, Scotty was impeached with prior criminal convictions of breaking and entering and larceny in 2002 and 2003, and a conviction of larceny from a building in 2004.

Based on the description in Scotty's direct testimony, defense counsel was able to identify one of the police officers who the defendants contended was yelling things at them from the street (the substance of which had been excluded by the judge). This officer, Officer Anthony Francis, was then called as a witness in the defense case. He denied using profanity, hearing other officers use the "f" word, or making racial or other demeaning statements to the defendants. Scotty was then recalled to the stand, where he identified Officer Francis as one of the officers who was yelling that evening. He testified that Officer Francis said, "[Y]ou two niggers go in the house or we're going to come up there and get you." He further testified that Officer Francis "called us bitches" and "invited us down to get locked up."

ii. *Paula Fortes's testimony.* Fortes and her two young sons lived above the Santos family in the third-floor apartment. She was awakened the night of the arrests by noise on the street outside her apartment. Fortes testified that she heard Jonathan yelling that he was on his property and his rights were being violated. When Fortes began to testify about what she heard the police officers yelling, the judge excluded the testimony except as to officers she could identify as speaking. She could only

give general physical descriptions of the officers, and what she heard them say was excluded. She was permitted to testify that she was shocked and scared by what she heard.

Fortes further testified that she went down the back stairwell of the building and knocked on the rear door of the Santoses' apartment. As soon as Scotty opened the door, he slammed it closed and Fortes heard the Santoses' front door breaking in. Fortes went back up the stairs to her apartment and locked the door. Once inside her apartment, Fortes heard the sound of footsteps up the back stairwell and then sounds of someone being beaten "at least twenty" times. After the police took Scotty and Jonathan out of the house, Fortes went down the back stairwell to the Santoses' door, where she observed "a blood bath" running from the third floor to the basement.

iii. *Alectre's testimony.* Alectre, the object of the celebration at 6 Levant Street, testified that on the evening of April 13, 2006, he was on leave from active duty but was about to return to Iraq. He testified that an unmarked police vehicle stopped in front of 6 Levant Street and two officers in plain clothes got out. Officer Ross came up to the porch of 6 Levant Street and attempted to talk to those gathered there, stopping Scotty and Jonathan from entering through their front door. Meanwhile, Officer Medina was on the street speaking to Wayne and Michael Tavares (Michael), Alectre's younger brother. Officer Ross yelled, "[G]un," and drew his weapon. Officer Medina also drew his weapon and told Wayne to get down on the ground. Both Wayne and Michael put their hands up. Wayne complied and remained on the ground while Michael stood with his hands up. Officer Medina lowered his gun, and Wayne got up off the ground and he and Michael walked away.

As more police cruisers arrived, Alectre saw Jonathan come out onto the second-floor porch. A black male officer was telling Jonathan to come out of the house, but Jonathan stated, "I ain't fucking opening no door." The officer then told Jonathan he would come up and get him, and Jonathan responded, "You can't fucking come up here without a warrant." The officer began to get mad. Alectre testified that several officers began to respond to Jonathan, but the judge would not allow Alectre to testify to what the officers said. After fifteen minutes of verbal

exchanges between the officers and Jonathan, Scotty came out on the porch and told Jonathan to come inside the house, but an officer said something to Jonathan that made Scotty turn around and respond. Scotty and Jonathan then continued to have an exchange with the officers.

c. *Excluded testimony.* Scotty, Fortes, and Alectre were prepared to testify that several unidentified officers declared: "Get down here and fight us like men"; "We're going to fuck you up"; "Man up and get down here"; and "If you don't get down here, we'll fucking come up and get you." The officers referred to Scotty and Jonathan Santos as "niggers," "bitches," and "pussies," and also yelled: "Why don't you fucking come down here?"; "Get the fuck down here"; and "Fuck you."

According to the parties' joint motion, defense counsel argued that the statements were essential to the defendants' cases because: (1) "they established the role of police in creating the public disturbance" for which the defendants were convicted; and (2) "they were essential to evaluating witness credibility."

2. *Discussion.* The Appeals Court correctly concluded, and the Commonwealth concedes, that the judge's exclusion of the officers' statements was error because the statements were not hearsay. See *Commonwealth v. Santos*, 76 Mass. App. Ct. 1123 (2010). As the court aptly noted in its unpublished memorandum,

> "In this case, the name calling, challenges, and threats were not offered for their truth. Thus, it was not necessary for the defendants to find an applicable exception to the hearsay rule when the officers' shouts were neither assertions nor offered for their truth. Each of the defendants was convicted of disturbing the peace based on the evidence of his conduct on the porch and, also, the officers' testimony that neighbors were at their windows, porches, and doors due to the disturbance the defendants created. In that context, testimony that the officers were shouting threats and calling names at the same time was both material and relevant, even if the defendants could not identify the individual officer who was speaking."

We turn to the appropriate standard of review to apply to the error.

The defendants contend that the error violated their constitutional rights to present a defense as guaranteed by art. 12 of the Massachusetts Declaration of Rights[10] and the Sixth Amendment to the United States Constitution,[11] as applied to the States through the due process clause of the Fourteenth Amendment. Essentially, they argue that by not allowing Scotty, Fortes, and Alectre to testify to the specific statements they heard the police officers yelling, the defendants were prevented from presenting the jury with the full picture of the events and were thereby deprived of their constitutional right to present a complete defense. Consequently, their convictions should be reversed "unless the error was harmless beyond a reasonable doubt." *Commonwealth* v. *Rembiszewski*, 391 Mass. 123, 126 (1984), and cases cited. We are not persuaded.

"Ordinarily, an error in the admission or exclusion of evidence is not of constitutional import." *Commonwealth* v. *Drew*, 397 Mass. 65, 78 n.13 (1986). The rulings at issue here were plainly evidentiary rulings that would not rise to the level of constitutional error unless they essentially effected the exclusion of an entire defense. See, e.g., *Commonwealth* v. *Conkey*, 443 Mass. 60, 66 (2004) ("defendant has a constitutional right to present evidence that another may have committed the crime"). While excluding the evidence may have adversely affected the credibility of the defense that the police officers caused the disturbance, the defense itself was still before the jury. We therefore review the error to determine whether the exclusion prejudiced the defendants. *Commonwealth* v. *Flebotte*, 417 Mass. 348, 353 (1994).

An error is nonprejudicial only if it "did not influence the jury, or had but very slight effect . . . . But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible

[10]Article 12 of the Massachusetts Declaration of Rights provides that "every subject shall have a right to produce all proofs, that may be favorable to him . . . and to be fully heard in his defence by himself, or his counsel, at his election."

[11]The Sixth Amendment to the United States Constitution provides that "the accused shall enjoy the right . . . to have compulsory process for obtaining witnesses in his favor."

to conclude that substantial rights were not affected." *Id.*, quoting *Commonwealth* v. *Peruzzi*, 15 Mass. App. Ct. 437, 445 (1983). The Appeals Court held the error to be harmless, reasoning that the evidence of inflammatory police statements was eventually placed before the jury. We conclude that in this case, which turned entirely on witness credibility, the excluded testimony, and the "tortuous" path through which a small portion of that testimony was eventually admitted in evidence, may have had a substantial impact on the jury's assessment of witnesses critical to the defense.

Scotty's testimony on direct examination regarding the nature and cause of the disturbance was sanitized by the rulings of the judge. His credibility with respect to events occurring in the house, about which he was the only defense witness, and which formed the basis of the assault and resisting arrest charges against him, was then substantially impeached by the prosecutor's use of his prior convictions. Only then was he able to testify to what he recalled one of the police officers to have yelled at Jonathan and him.

The testimony of the two civilian witnesses, who had nothing at stake in the cases, that would have corroborated Scotty's testimony about what transpired outside the house and likely bolstered the credibility of his testimony about what had occurred inside the house, was then also neutralized by the judge's evidentiary rulings. In these circumstances, we cannot say that the excluded evidence would not have "influence[d] the jury" or would have "had but very slight effect." *Commonwealth* v. *Flebotte, supra.*

3. *Conclusion.* For the foregoing reasons, the defendants' convictions are reversed, the verdicts are set aside, and the cases are remanded for a new trial.[12]

*So ordered.*

---

[12]During closing arguments, the prosecutor told the jury that the responsibility of defense counsel was to create as much confusion as possible by questioning every witness at great length. Scotty contends that this was prejudicial error. We need not reach the issue because we reverse the convictions on the evidentiary error.