RODRIGUEZ, COMMONWEALTH vs., 101 Mass. App. Ct. 439

 
 COMMONWEALTH vs. MICHAEL RODRIGUEZ.

101 Mass. App. Ct. 439
 January 6, 2022 - July 27, 2022

Court Below: Superior Court, Hampden County
Present: Green, C.J., Vuono, Meade, Sullivan, & Henry, JJ. [Note 1]

 

Amended August 5, 2022.

No. 19-P-621.

Homicide. Self-Defense. Evidence, Inflammatory evidence. Practice, Criminal, Instructions to jury, Verdict.

At a murder trial, the Superior Court judge did not abuse his discretion in permitting a witness to testify, over objection, that the defendant, several years after the killing, twice referred to the victim, who was a Black man who was enlisted in the Army National Guard, by using a racial epithet and describing him as a soldier whom the defendant shot, where, in context, the probative value of the evidence (i.e., it was relevant as an admission and probative in that it established that the defendant knew the victim's race and occupation and that the defendant was the person who shot the victim at close range) was not substantially outweighed by the prejudicial effect arising from the inflammatory nature of the epithet, in that the evidence of self-defense was weak, the evidence of guilt was strong, the words of the admission were the defendant's own, and the suggestion by defense counsel that the statement be modified (either by substituting a less inflammatory descriptor of the victim's race, or by excising the word entirely) risked tampering with the details of important evidence coming directly from the defendant and admitting to the crime; moreover, even if, in any event, it had been error to allow the witness to relate the defendant's admission without redaction of the racial epithet, given the strong evidence of guilt, given that the Commonwealth's case did not rise and fall on the jury's assessment of the witness's testimony about the defendant's admission, and given that any prejudicial impact caused by the epithet was significantly attenuated from the analytical question the jury considered in weighing the defendant's claim of self-defense, it was unlikely that the jurors were swayed significantly by the defendant's use of an epithet in reference to the victim, in a statement to another person years after the assault, to conclude that the defendant did not act in self-defense. [445-449] Sullivan, J., dissenting, with whom Henry, J., joined.

At a murder trial, the judge's misstatement in his charge to the jury on excessive force in self-defense was a slip of the tongue that was isolated and discrete 

 Page 440 

and did not require a new trial. [449]

A Superior Court judge did not abuse his discretion in denying the defendant's motion to reduce the verdict of murder in the second degree to voluntary manslaughter, where, in addition to the many credibility findings that fell within the jury's exclusive purview, the evidence of an open car door near the defendant at the time of the shooting permitted the jury to conclude that the defendant had an adequate means of escape from the victim and to reject not only the defendant's claim of self-defense but also the use of excessive force in self-defense. [449-450]

Indictments found and returned in the Superior Court Department on March 30, 2015.

 The cases were tried before John A. Agostini, J., and a motion to reduce the verdict was considered by him.

 Robert F. Hennessy for the defendant.

 Kelsey A. Baran, Assistant District Attorney, for the Commonwealth.

 GREEN, C.J. The defendant, Michael Rodriguez, was charged with murder in the first degree in the shooting death of Julian Cartie. After a jury trial, he was convicted of murder in the second degree. G. L. c. 265, § 1. [Note 2] The sole issue at trial was whether the defendant acted with malice and premeditation, or whether he acted in self-defense. Percipient witnesses testified, as did the defendant. Portions of the confrontation were recorded by several surveillance video cameras, though the shooting itself was not recorded. On appeal, the defendant claims that the judge abused his discretion by permitting a witness to testify, over objection, that several years after the killing the defendant twice referred to Cartie as the "nigger soldier I shot." [Note 3] For the reasons that follow, we discern no error. We further conclude that none of the defendant's other claims of error warrant a new trial or a reduction in the verdict, and we accordingly affirm the judgments and the order denying the defendant's motion to reduce the verdict.

 Background. We summarize the evidence presented to the jury, reserving some additional facts for later discussion. After a night out at a club in Springfield, Cartie, his brother, Nathan Alvarado, and a friend, Angelo Delgado, Jr., stopped at a restaurant located 

 Page 441 

nearby. The defendant and a group of his friends had also been at the club, although the two groups did not know each other and did not interact while at the club. Both groups were drinking heavily, and left the club at closing time, around 1:30 to 2 A.M. on February 22, 2009.

 Once they reached the restaurant, Cartie's group parked their car, and Delgado stopped to relieve himself. The car in which the defendant was a passenger drove past. The defendant was in the front passenger's seat. The car belonged to the driver, the defendant's girlfriend. An acquaintance and his girlfriend were in the back seat. Cartie thought that there were only women in the car and started to yell at the car.

 When the car stopped at a red light, the defendant got out and walked down the street in Cartie's direction. A surveillance video recording obtained from the restaurant shows the defendant picking up a rectangular object from the ground. As set forth more fully infra, the defendant testified that he dropped his cell phone and got out of the car to retrieve it. An argument ensued between Cartie and the defendant. Neither Delgado nor Alvarado could recall what was said, although profanities were involved. The defendant's girlfriend and one of the back seat passengers also testified that they did not hear the exchange.

 The witnesses recounted different versions of what happened next, but it is undisputed that the defendant had a loaded firearm when he got out of the car and that he shot Cartie five times within ninety seconds. 

 Alvarado testified that the defendant, while still in the passenger's seat of the car, raised a gun, cocked it in a sideways manner, and flashed it toward them. [Note 4] The video recording from the restaurant depicts the defendant picking something up from the ground and walking backward in the direction of his girlfriend's car. Cartie, followed by Delgado and Alvarado, walked toward the defendant.

 At some point the defendant drew a gun, and Delgado saw him cocking it. Cartie's companions saw the gun and "screamed out" to warn Cartie, "yelling" that the defendant had a gun, but Cartie did not heed the warning and kept moving toward the defendant. 

 Page 442 

The pace at which Cartie approached -- i.e., fast or moderate -- was in dispute. A witness who was also stopped at the red light testified that Cartie and his companions approached the defendant at a fast pace, quickly enough that it caught her eye. [Note 5] 

 The defendant backed away from Cartie toward the car's open passenger door. According to Alvarado, the defendant sat down, but stood up when Cartie got within arm's length and fired. Delgado testified that, when the defendant raised the gun and pointed it at Cartie, Cartie put his right hand out. Delgado said that the defendant looked scared and shot when he was backed up against the passenger door, which was open when the shots were fired. 

 Cartie collapsed on the street and died as a result of the gunshot wounds, two of which entered the left side of his chest; a third entered his abdomen. According to the medical examiner, somewhere between three and five shots were fired at close range. There was stippling on Cartie's chest from gunpowder, and a through-and-through wound began at Cartie's finger and exited through the right palm. The medical examiner could not say with certainty where Cartie's right hand was at the time of the shooting. It could have been down by the abdomen, but Cartie's hand may have been outstretched toward the defendant, in which case the bullet traversed Cartie's hand and entered his chest. Toxicology tests conducted by the medical examiner showed that Cartie's blood alcohol level was 0.31.

 The defendant testified at trial. He told the jury that he opened the car door to spit, dropped his cell phone, and got out of the car to retrieve it. At this point Cartie was standing by his own parked car. The defendant heard people yelling at him, but he was unable to understand everything they said because he did not "know English very well." The defendant told the men, in Spanish, to respect him because they did not know each other. In response, according to the defendant, Cartie became angry, threatened the defendant, saying, "I'm going to fuck you up," and Cartie and his two companions rushed toward the defendant. The defendant did not see a weapon but testified that Cartie's arm was behind his back. The defendant had a gun tucked in the waistband of his pants.

 Page 443 

 The defendant was five feet, eight inches tall and weighed 110 pounds. There was evidence that Cartie was five feet, nine inches tall and weighed 181 pounds. Cartie was a member of the National Guard and in excellent physical condition.

 As Cartie and the others advanced toward him, the defendant backed away, pulled out a gun, and chambered a round of ammunition. The defendant claimed that because he was outnumbered and Cartie was much bigger than he was, he pointed the gun at Cartie to stop his advance. According to the defendant, Cartie kept coming toward him and stated, "I'll kill you." The defendant said he told Cartie in English more than once to "back up." According to the defendant, Cartie continued to advance quickly. The video recording confirms that Cartie and the others continued to move forward, while the defendant backed up.

 The defendant testified that he fired the weapon to stop Cartie's advance once Cartie "was on top of [him]," that he did not have time to run or get in the car because Cartie approached him at a rapid pace, that he was outnumbered and scared, that he thought Cartie was trying to kill him, and that he felt he did not have any other choice but to shoot. Cartie's last steps and the shooting occurred off camera. The video recording shows only a bright burst of light and smoke when the defendant shot Cartie. The defendant fled the scene in his girlfriend's car. He dismantled the gun and threw the disassembled parts into the river in the Indian Orchard section of Springfield.

 Over five years after the shooting, in April 2014, a report to the Springfield police department's "Text-a-Tip" line led investigators to the defendant's (by then) former girlfriend, who had driven the car the night Cartie was killed. The former girlfriend initially declined to cooperate with the investigation when contacted in May of 2014. The police then arrested her as an accessory after the fact in September of 2014. She obtained counsel and agreed to cooperate. In October of 2014, the defendant asked a lawyer to check for outstanding warrants for him, after hearing that police had made inquiries about him to his mother-in-law. He was not apprehended until December 1, 2014. 

 Once apprehended, the defendant was held in custody. In recorded telephone calls placed by the defendant from jail in September of 2015, the defendant asked a friend nicknamed "Bebo" whether the defendant's former girlfriend had told anyone what her lawyer was recommending. The defendant told Bebo, 

 Page 444 

"That guy [her lawyer] ain't worth shit. . . . [A]ll he ever wants is people to cop out and for people to cooperate . . . ." The defendant repeatedly asked Bebo to "get ahold of her," and tell her the lawyer "is doing nothing for her to dump him the fuck out, and . . . to talk to my lawyer to follow his lead." He added, "[T]hat guy's going to fuck up her life and mine. . . . He's going to try to get her to stick her foot in it and tell a lie to harm me . . . ." The defendant also offered to pay his former girlfriend's legal fees.

 Jose Rodriguez was present for and participated in the September 2015 conversation from the jail. Rodriguez [Note 6] (no relation to the defendant) was a cooperating witness who was incarcerated in the same facility on charges of assault and battery, violation of a restraining order, and attempted breaking and entering of a motor vehicle. Rodriguez knew the defendant and testified that he had purchased drugs from the defendant in the past. [Note 7] Rodriguez also testified that the defendant approached him in jail after the call to Bebo and asked Rodriguez whether he had ever killed someone (to which Rodriguez responded "yes"), and then asked "if mysteriously the bail appeared, would I be willing to do something." The defendant did not want to serve a life sentence and was worried about his former girlfriend "because she was there the night of the incident."

 According to Rodriguez, the defendant had also talked about the killing of Cartie in the spring of 2014, before the defendant was arrested, when both men were at liberty. [Note 8] Rodriguez said that the defendant heard that law enforcement was looking for him and twice stated that "it has to be for the n[--] soldier I shot." Rodriguez also claimed that on one occasion the defendant gave $2,500 in money orders to Bebo and said (referring to his former girlfriend), "This is for her. Tell her to keep her effing mouth shut." The defendant, a light skinned Latino man, denied using the racial epithet, stating that his grandmother, uncle, former wife, and daughter were Black, that "I got African American family. I love them. I know that word offend -- offend that people." He 

 Page 445 

denied asking Rodriguez to kill his former girlfriend. [Note 9]

 The defendant's former girlfriend testified at trial without immunity or an agreement regarding disposition of the charge against her. She told the jury that the defendant had been in the front passenger's seat of her car, that he got out, that she did not see what happened, and that she did not discuss the shooting with him at any point during the course of their relationship, which lasted for several months thereafter. The male back seat passenger testified that he was drunk and asleep, and awoke to the sounds of gunfire and people shouting. He also said he did not discuss the events with the defendant.

 Discussion. The principal issue on appeal is whether the judge properly allowed Rodriguez to relate the defendant's use of "n--" in his statement referring to "the n[--] soldier I shot." As the defendant's claim of error was preserved, we review for prejudicial error. See Commonwealth v. Rintala, 488 Mass. 421, 426 (2021).

 The defendant objected to admission of the racial epithet included within the defendant's admission, in particular. [Note 10] He requested that the epithet be redacted from Rodriguez's testimony. The prosecutor argued that the statement as a whole was an admission to the crime and that "it's difficult to kind of pick and choose what you want to really redact when what the witness says is the defendant's statement." The judge considered the matter overnight and then denied the motion. 

 As a threshold matter, we observe that the statement attributed to the defendant was admissible as a statement of a party. See Mass. G. Evid. 801(d)(2) (2022). See also Commonwealth v. Bonomi, 335 Mass. 327, 347 (1957) ("An admission in a criminal case is a statement by the accused, direct or implied, of facts pertinent to the issue, which although insufficient in itself to warrant a conviction tends in connection with proof of other facts to 

 Page 446 

establish his guilt"). The question before us is whether the judge abused his discretion in concluding that its probative value was not substantially outweighed by any unfair prejudicial effect it might have on the jury. See Commonwealth v. Bishop, 461 Mass. 586, 596 (2012) ("We review a judge's decision whether the probative value of evidence is substantially outweighed by the danger of unfair prejudice under the abuse of discretion standard"). The admission of racial epithets bears particular scrutiny because such evidence "poses a risk of inflaming a jury's emotions." Id. Therefore, before "admit[ting] evidence that a defendant used this word to describe a man of color, the judge must be convinced that the probative weight of such evidence justifies th[e] risk." Id.

 We discern no abuse of discretion in the judge's conclusion in the present case that the probative value of the evidence was not substantially outweighed by its prejudicial effect. The context is critical. The victim was killed in 2009, and the investigation continued for nearly five years before centering on the defendant as the perpetrator. The victim was a Black man who was enlisted in the Army National Guard. He was unarmed at the time he was shot twice in the chest and once in the abdomen, at close range. Though the encounter between the victim and the defendant was captured in part on a video recording, the recording did not depict the shooting itself, and the resolution of the recording was poor and the shooter could not be identified from the images it depicted. Instead, a tip in 2014 began to lead investigators to the defendant. During the course of the investigation, investigators learned of Rodriguez's claim that the defendant had described to him (in April or May of 2014) that United States marshals "came looking for me." And, in response to Rodriguez's question about why the marshals would be looking for him, the defendant said, "[T]hat's probably for me killing that n[--] soldier." In context, then, the statement was relevant as an admission, placing the defendant at the scene of the crime, and as the shooter responsible for the victim's death. Though the term used by the defendant to describe the victim's race was deeply offensive, it was probative because it demonstrated that the defendant knew both the race and occupation of the victim (in other words, not simply a soldier, but a Black soldier). The evidence was also corroborative of evidence gathered from other sources during the investigation, specifically that the victim died from a gunshot at close range. However, none of that other evidence directly established that it was the defendant who shot the victim. Though the defendant 

 Page 447 

admitted that he shot the victim during his testimony, as part of his presentation of his claim of self-defense, there was no guarantee during the Commonwealth's case that the defendant would testify.

 To be sure, the inflammatory nature of the epithet was not without potential for prejudice. However, in balancing potential prejudice against probative value, we observe that, having established the defendant as the person who shot the victim at close range, the evidence of self-defense was weak, and the evidence of guilt was strong. Moreover, the words of the admission were the defendant's own, and the suggestion by defense counsel that the statement be modified (either by substituting a less inflammatory descriptor of the victim's race, or by excising the word entirely) risked tampering with the details of important evidence coming directly from the defendant and admitting to the crime. As in Bishop, 461 Mass. at 596-597, we conclude that the judge did not abuse his discretion in concluding that the defendant's words, admitting that he killed the victim, were more probative than prejudicial. See Commonwealth v. Rosa, 468 Mass. 231, 242 (2014); Commonwealth v. Mendes, 441 Mass. 459, 467 (2004). 

 The defendant argues, and our dissenting colleagues agree, that Commonwealth v. Chalue, 486 Mass. 847, 885 (2021), compels a conclusion that the prejudicial effect of the racial epithet substantially outweighed its probative value, since the Commonwealth did not prosecute its case on a theory that the defendant held racial animus. [Note 11] Post at 451. We do not read Chalue so broadly as to create a categorical bar against the admission in evidence of a defendant's statement containing a racial epithet in any case that does not rest on a theory of racial animus. Indeed, the court's holding in Chalue was cast expressly by reference to the particular context of that case, which included substantial evidence that the defendant was a member of the Aryan Brotherhood; in that context, the court concluded, the racial epithet implied that the murder was racially motivated. See id. No comparable racial context appeared in the present case. [Note 12] 

 In any event, even if it was error to have allowed Rodriguez to relate the defendant's admission without redaction of the racial epithet, we are satisfied that "the error did not influence the jury, 

 Page 448 

or had but very slight effect" (quotation and citation omitted). Commonwealth v. Flebotte, 417 Mass. 348, 353 (1994). As discussed above, the sole reference to the racial epithet came through Rodriguez's testimony relating the defendant's admission that he killed Cartie; the greatest probative force of that statement surely was in establishing the defendant's awareness that he killed the victim, and in his admission of that fact. The epithet otherwise received no comment or other attention. Unlike in Chalue, 486 Mass. at 884-885, the Commonwealth made no mention of the racial epithet in its opening statement or closing argument. See Commonwealth v. Dobbins, 96 Mass. App. Ct. 593, 598 (2019). The context and lack of prominence of the racial epithet in the present case suggests that the impact flowing from the epithet was far less significant than in Chalue, a case in which the Supreme Judicial Court declined to grant a new trial based on the error. [Note 13]

 The evidence of guilt in the present case was also strong. Though (as the dissent observes, see post at 454) the evidence was contested at every turn, that is typical of many criminal trials. We consider highly significant the testimony of the medical examiner that the defendant fired three to five shots at the victim at close range, and the evidence that the victim suffered two shots to his chest and one to his abdomen -- evidence that stands in tension with the defendant's claim of self-defense. Furthermore, the defendant's conduct following the shooting (including his disposal of the murder weapon) displayed consciousness of guilt. The conversations in which the defendant attempted to influence his former girlfriend's testimony were recorded. Accordingly, and contrary to the characterization by our dissenting colleagues, because significant portions of the Commonwealth's case were corroborated by forensic evidence, a surveillance video recording, or undisputed testimony from other witnesses, the Commonwealth's case did not rise and fall on the jury's assessment of Rodriguez's testimony about the defendant's admission. See post at 455-457. We also note that the defendant's statement including the racial epithet, which the jury could have understood to constitute an acknowledgement that he had killed the victim, included no qualifying suggestion that he had done so in self-defense. In addition, the judge instructed the jury at the beginning of trial to "put aside any opinions or biases and prejudices and . . . 

 Page 449 

decide this case solely on the facts presented during this trial," and instructed in his final charge that "[e]motions or sympathy for one side or the other play absolutely no role in this proceeding." The jury's verdict of guilty on the lesser included offense of murder in the second degree, rather than the indicted charge of murder in the first degree, reflected their rejection of the Commonwealth's theory that the defendant acted with deliberate premeditation or with extreme atrocity or cruelty, and is a strong indication that the jury thoughtfully considered the evidence and were not unduly influenced by Rodriguez's attribution of a reprehensible racial epithet to the defendant. Finally, any prejudicial impact caused by the epithet was significantly attenuated from the analytical question the jury considered in weighing the defendant's claim of self-defense. Put simply, it is unlikely that the jurors were swayed significantly by the defendant's use of an epithet in reference to the victim, in a statement to another person years after the assault, to conclude that the defendant did not act in self-defense. 

 The defendant's remaining arguments require little discussion. The misstatement by the trial judge in his charge to the jury on excessive force in self-defense [Note 14] was, as in Commonwealth v. Koonce, 418 Mass. 367, 370 (1994), a "single slip of the tongue" that was "isolated and discrete," and does not require a new trial. As in Koonce, the trial judge instructed the jury repeatedly that the Commonwealth, and the Commonwealth alone, held the burden of proof, including that "the defendant has no burden whatsoever to produce any evidence during this trial," and that "[t]he burden is on the Commonwealth to prove the defendant guilty beyond a reasonable doubt . . . and that burden never shifts." In addition, the judge gave the jury a full copy of his instructions, which did not include the erroneous statement, for reference during their deliberations.

 Finally, we discern no abuse of discretion in the trial judge's denial of the defendant's motion, pursuant to Mass. R. Crim. P. 25 (b) (2), as amended, 420 Mass. 1502 (1995), to reduce the verdict of murder in the second degree to voluntary manslaughter. See 

 Page 450 

Commonwealth v. Grassie, 482 Mass. 1017, 1017 (2019). In addition to the many credibility findings that fell within the jury's exclusive purview, the open car door permitted the jury to conclude that the defendant had an adequate means of escape from the victim and to reject not only the defendant's claim of self-defense but also the use of excessive of force in self-defense.

 Judgments affirmed.

 Order denying motion to reduce verdict affirmed.

 SULLIVAN, J. (dissenting, with whom Henry, J., joins). In a trilogy of cases culminating in Commonwealth v. Chalue, 486 Mass. 847, 885 (2021), [Note Dissent-1] the Supreme Judicial Court significantly limited the otherwise broad discretion of a trial judge ruling on an objection to the admissibility of the racial epithet "n--." In Chalue, the Supreme Judicial Court held that where racial animus was not at issue in a murder trial, evidence that a joint venture codefendant referred to one of the victims as a "n--" was improperly admitted. In this case, racial animus also was not at issue. Rather, a three-time jail house informant claimed that some five years after the shooting, the defendant referred to "the n[--] soldier I shot." [Note Dissent-2] The defendant specifically requested that the racial epithet be omitted if the statement attributed to the defendant by the informant was admitted. The trial judge, who did not have the benefit of Chalue, supra, considered the matter overnight and then denied the motion, admitting the statement in full.

 On appeal, no one disputes that the statement attributed to the defendant that he shot the soldier was admissible as the admission of a party opponent. What is at issue is the decision to admit in evidence the racial epithet, "n--." The Commonwealth agrees that racial animus was not part of its theory at trial and that, in context, the term "n--" was used in a derogatory manner.

 Page 451 

 Because the prejudicial effect flowing from "n--" substantially outweighed its probative value, Chalue requires that we find that the racial epithet was improperly admitted. Further, this epithet was prejudicial because the evidence -- while sufficient -- was not overwhelming, key accounts of the confrontation were in conflict, and credibility determinations were at the heart of the case. I therefore dissent.

 "We review a judge's decision whether the probative value of evidence is substantially outweighed by the danger of unfair prejudice under the abuse of discretion standard." Commonwealth v. Bishop, 461 Mass. 586, 596 (2012). The admissibility of racial epithets bears particular scrutiny because such evidence "poses a risk of inflaming a jury's emotions." Id. Therefore, before "admit[ting] evidence that a defendant used this word to describe a man of color, the judge must be convinced that the probative weight of such evidence justifies th[e] risk." Id.

 "The most significant factor in determining whether racial references are improper is the extent to which they have probative value with respect to the issues at trial." Commonwealth v. Washington, 28 Mass. App. Ct. 271, 273 (1990), S.C., 97 Mass. App. Ct. 595 (2020). For example, where racial animus is relevant to motive, the probative value of a racial epithet uttered by a defendant may outweigh its prejudicial effect, provided steps are taken to minimize the attendant prejudice. See Commonwealth v. Cruzado, 480 Mass. 275, 279 (2018). See generally Commonwealth v. Gonsalves, 488 Mass. 827, 834-835 (2022) (unchallenged evidence that defendant said he "poked the n-- up" or "poked the kid" relevant to show extreme atrocity or cruelty); Commonwealth v. Javier, 481 Mass. 268, 281 (2019) (defendant's use of racial epithet at time of murder relevant to show motive, revenge, and intent to harm); Commonwealth v. Santos, 460 Mass. 128, 136 (2011) (testimony that police officers used racial and misogynistic epithets to provoke fight was relevant to who created disturbance in prosecution for disturbing peace); Commonwealth v. Zammuto, 89 Mass. App. Ct. 80, 85 (2016) (relevance of racial epithet in civil rights prosecution).

 However, where, as here, the Commonwealth "[is] not prosecuting the case on such a theory," the prejudicial effect of a racial epithet ordinarily substantially outweighs its probative value. Chalue, 486 Mass. at 885. This particularly repugnant racial epithet had little or no probative value, and should have been redacted, as requested. Again, Chalue is both instructive if not controlling.

 Page 452 

 In Chalue, 486 Mass. at 858, the defendant was convicted of kidnapping and murdering three men, as well as witness intimidation. All three victims were shot, stabbed and dismembered. The Commonwealth prosecuted Chalue and two other defendants in separate trials and obtained convictions of murder in the first degree in each. The evidence against Chalue at his trial included his oral and written admissions to four different fellow inmates to the effect that he had "three bodies" and that he had "made them disappear" after the victims were "tortured beyond torture." Id. at 855. Two of the admissions consisted of conversations with and letters to fellow members of the Aryan Brotherhood admitting to the crime. The Supreme Judicial Court ruled that the probative value of the Aryan Brotherhood evidence was not substantially outweighed by its prejudicial effect because Chalue's membership in the organization made it more likely than not that the defendant would confide in fellow members. In addition, the judge carefully screened the jurors during individual voir dire, and repeatedly gave appropriate limiting instructions.

 However, the Supreme Judicial Court drew the line at testimony that a different (joint venture) defendant had referred to two of the victims as the "the fat guy and the n[--]," testimony that the prosecutor referenced in both opening statement and closing argument. Chalue, 486 Mass. at 884-885. The court held that where racial animus was not offered as a motive at trial, the risk of unfair prejudice substantially outweighed any probative value because, combined with the Aryan Brotherhood evidence, the racial epithet implied that the murders were racially motivated. The court concluded, however, that there was no risk of a substantial likelihood of a miscarriage of justice because the evidence against the defendant was simply overwhelming. Id. at 885.

 Chalue compels the conclusion that the racial epithet in this case was admitted in error. In Chalue, as here, the epithet was embedded in an admission. Nonetheless, the Supreme Judicial Court held that the epithet should not have been admitted. Unlike Chalue, the epithet in this case was attributed directly to the defendant, rendering it even more prejudicial. And while the jury in Chalue may not have been shocked to learn that members of the Aryan Brotherhood used racial epithets, the testimony that the defendant here had used the epithet "n--" injected racial animus into a case where racial animus was otherwise absent.

 The unnecessary and prejudicial epithet could not help but provoke the emotions of the jury. See Bishop, 461 Mass. at 596. 

 Page 453 

The same information could have been placed before the jury without the use of the epithet. See infra. If we are to apply the law consistently, I am hard pressed to see how the pejorative use of the word "n--" is unduly prejudicial when embedded in an admission to multiple homicides attributed to a member of the Aryan Brotherhood, but admissible when embedded in a statement attributed to this defendant. Any factual differences between this case and Chalue are not significant enough to justify the different outcomes on the question whether the prejudicial effect of the epithet substantially outweighed its probative value. Moreover, nobody contended that the defendant used the epithet on the night in question. The statement attributed to the defendant was allegedly made years after the killing and therefore had little probative value, in a case where racial animus was not at issue, as to the defendant's state of mind at the time of the shooting. Contrast Javier, 481 Mass. at 281.

 Because it was error to admit the epithet, and the defendant's objection was fully (and precisely) preserved, it is necessary to assess whether the error was prejudicial under the "far more stringent standard" of prejudicial error. Commonwealth v. Hrabak, 440 Mass. 650, 657 n.6 (2004). Compare Chalue, 486 Mass. at 884 (where defendant did not object, court reviewed for substantial likelihood of risk of miscarriage of justice). "An error is nonprejudicial only [i]f . . . the conviction is sure that the error did not influence the jury, or had but very slight effect" (quotation and citation omitted). Commonwealth v. Flebotte, 417 Mass. 348, 353 (1994). The burden is on the Commonwealth to "show with fair assurance . . . that the judgment was not substantially swayed by [the error]" (quotation and citation omitted). Rintala, 488 Mass. at 444.

 The Commonwealth has not carried its burden here. The statement that the defendant said he shot that soldier could have been admitted. The witness could also have been asked if the defendant identified the race of the soldier, thus giving the admission its full probative weight. [Note Dissent-3] The epithet "n--," to which the defendant lodged timely and repeated objections, created "the risk that the 

 Page 454 

jurors could draw inappropriate conclusions about [the defendant's] propensity toward criminality based on the language." Commonwealth v. Rosa, 468 Mass. 231, 241 (2014). [Note Dissent-4] More simply put, the jury could have thought that any person who used this word in a derogatory manner was a bad person who was more likely to have attempted to shoot Cartie out of malice, as opposed to self-defense, and to harm a witness.

 This is exactly the kind of error that may sway a jury in a hotly contested case. "Numerous aspects of a proceeding may be relevant to a determination whether the errors were likely to have 'substantially swayed' the jury. These include, inter alia, the strength of the Commonwealth's case, Commonwealth v. Clary, 388 Mass. 583, 590-591 (1983); the jury's ability to distinguish between permissible and excessive lines of argument in the attorneys' closings, [Commonwealth v.] Bradshaw, 385 Mass. [ 385 Mass. 244,] 277 [(1982)]; whether 'defense counsel seasonably objected,' [Commonwealth v.] Santiago, 425 Mass. [491,] 500 [(1997), S.C., 427 Mass. 298 and 428 Mass. 39 (1998)]; whether 'the errors . . . went to the heart of the issues at trial or concerned collateral matters,' id.; and whether the judge adequately mitigated the errors with proper limiting instructions, id." Commonwealth v. Peno, 485 Mass. 378, 399-400 (2020). See Commonwealth v. Rodriguez, 92 Mass. App. Ct. 774, 780 (2018).

 Turning to the strength of the case, the Commonwealth was required to prove that the defendant committed murder in the first or second degree and that the defendant had not acted in 

 Page 455 

self-defense or used excessive force in self-defense. The defendant weighed 110 pounds. Cartie, whose blood alcohol level was 0.31, weighed 181 pounds, was in the National Guard, and was in excellent physical condition. Cartie came toward the defendant flanked by two other men, outnumbering the defendant three to one. A disinterested observer corroborated the defendant's testimony that Cartie approached rapidly. Cartie's brother and a friend told different (more damning) versions of the events at trial than they did to the police, and were impeached with the inconsistencies, [Note Dissent-5] but they both told the jury that as Cartie approached the defendant, the defendant retreated. Cartie's friend told the jury that they "screamed out" and "yelled" at Cartie to stop when they saw the gun, but that Cartie did not heed the warning and kept moving toward the defendant. The video recording also showed that Cartie kept advancing as the defendant backed up. The video recording did not show the shooting but permitted a range of inferences supporting any verdict as to which the jury were instructed. And there was the defendant's testimony, which the jury could credit or reject, that Cartie had his hand behind his back, that he threatened to kill the defendant, and that the defendant thought Cartie might be armed. In fact, Cartie's friend testified that the defendant was backed against the open passenger door of his girlfriend's car and looked scared when he fired the gun. The jury were also permitted to consider that the car was blocked at both ends at a red light. [Note Dissent-6]

 The majority says that the evidence of guilt was strong, but that depends on who the jury believed. See ante at 447, 448. Perhaps the most incendiary testimony came from Rodriguez, the informant who reported that the defendant admitted to the shooting. Rodriguez placed the defendant at the center of a plot to kill his former girlfriend in order to prevent her from testifying, a claim the defendant denied. [Note Dissent-7] This testimony, if believed, would eviscerate a claim of self-defense. Interlaced with this testimony was the coup de grace that the defendant referred to Cartie as the "n[--] soldier I shot," a statement the defendant also denied making. 

 Page 456 

The use of the epithet, juxtaposed with the other testimony, reinforced the notion that the defendant was just the kind of bad person who would put a "hit" on his former girlfriend, or kill someone on purpose for no reason.

 Yet Rodriguez's credibility was subject to sustained attack. Omitted from the majority opinion is the fact that Rodriguez did not inform his State police contact of the conversations he had with the defendant in 2014 until 2015, out of (in his words) "a concern for [the former girlfriend's] safety." However, on cross-examination it emerged that women's safety was not Rodriguez's forte. Rodriguez's former wife had obtained a permanent restraining order against him, and he had been convicted of violating that order up to nine times. Rodriguez was a drug user with a daily habit who also had previous convictions for breaking and entering, burglary in the nighttime with intent to commit a felony, assault and battery, larceny over $250, and burglary in the daytime with intent to commit a felony. He had a "friendship" with a State police trooper and had cooperated with law enforcement in two States on two previous occasions, one of which included his report of a murder for hire plot. Rodriguez also admitted that while in jail he told people things that were not true when it was to his advantage. [Note Dissent-8]

 On the other side of the coin, the defendant's credibility issues were significant, but resolution of some of those credibility problems was not self-evident. He backed into the open passenger door of the car, which was stopped at a red light, but did not try to get in and lock the door. As to the number of shots fired, as the majority points out, three to five shots are consistent with an intent to kill, i.e., malice. See ante at 448. But three to five shots are also consistent with panic, i.e., manslaughter or self-defense. He was carrying a weapon that he disposed of after the shooting, and he fled the jurisdiction. He was impeached with a prior conviction of possession of cocaine with intent to distribute. If the informant was believed, the defendant tried to silence his former girlfriend. The case turned on whom the jury credited, and to what degree.

 The erroneously admitted epithet went to the "heart" of the central issue in the case, namely credibility. Peno, 485 Mass. at 400. 

 Page 457 

Where credibility is key, we cannot be "sure" that "the error did not influence the jury, or had but very slight effect." Flebotte, 417 Mass. at 353. See Commonwealth v. Parent, 465 Mass. 395, 401-402 (2013) (exclusion of prior inconsistent statements prejudicial where "credibility was the sole issue at trial"); Commonwealth v. Lopez, 91 Mass. App. Ct. 572, 578 (2017) (erroneous admission of evidence that vouched for credibility of victim was prejudicial). Cf. Santos, 460 Mass. at 138 (improper exclusion of use of racial and misogynistic epithets by police in prosecution "which turned entirely on witness credibility . . . may have had a substantial impact on the jury's assessment of witnesses critical to the defense"); Commonwealth v. Salone, 26 Mass. App. Ct. 926, 929 (1988) (improperly admitted evidence of defendant's bad temper in case involving self-defense created substantial risk of miscarriage of justice where "[t]he decisive issue . . . was the credibility of the complainant and the defendant who testified to conflicting versions"). The evidence against the defendant was overwhelming only if "one accepts as true" the testimony of Rodriguez and other Commonwealth witnesses and disbelieved the defendant. Commonwealth v. Beattie, 409 Mass. 458, 460 (1991). See Commonwealth v. Ford, 397 Mass. 298, 301-302 (1986) ("Credibility is for the jury, not for appellate courts"). Depending on who the jury believed and to what extent, the jurors could have returned a verdict of murder, manslaughter, or an acquittal. [Note Dissent-9]

 Nor did other aspects of the trial ameliorate the prejudice. With respect to the remaining Peno factors, because racial animus was not presented as an issue at trial, there was no "individual voir dire of potential jurors to eliminate potential bias." Cruzado, 480 Mass. at 279. The judge did not give a limiting instruction regarding the racial epithet itself, nor was one requested. See id. Compare Commonwealth v. Hall, 485 Mass. 145, 171 (2020). The prior bad act instruction given during Rodriguez's testimony was general, directing the jury to consider whether the testimony showed a relationship and familiarity between Rodriguez and the defendant, and did not address the potentially inflammatory effect 

 Page 458 

of a racial epithet. Although the prosecutor did not refer to the epithet in closing argument, she did refer to the statement about the "soldier that he killed," a reference sufficient to remind the jury of the more inflammatory aspects of the statement attributed to the defendant. [Note Dissent-10] The term "n--" could hardly have gone unnoticed.

 In sum, because the defendant's use of a racial epithet tended to suggest that the defendant was a bad person who had a propensity to commit crimes, the improperly admitted racial epithet could have influenced the jury's credibility determinations. "We do not know and will not guess whether the jury accepted [the Commonwealth's testimony or the defendant's] denial[s] as true. The recognition that the improperly admitted [evidence] could have had a significant impact on the jury's evaluation of the . . . central issues of the case . . . is sufficient for us to conclude that the error was prejudicial and the defendant is entitled to a new trial." Commonwealth v. Esteves, 429 Mass. 636, 641 (1999). See Santos, 460 Mass. at 138.

 A final note. This is a very difficult case. Undoubtedly, some judges will be wary of sanitizing testimony, especially where, as here, the objectionable language is contained in an alleged admission. Others may believe that careful voir dire and contemporaneous instructions will, in many circumstances, mitigate the prejudice associated with racially charged language, even in a case where racial animus is not at issue. But the Supreme Judicial Court made a different calculus in Chalue, Rosa, and Bishop, one predicated on the understanding that as our society presently exists, racial epithets, when used to degrade, are so charged that they may unnecessarily interfere with a fair trial where racial animus is not at issue. I do not think this court is at liberty to alter that calculus. The majority opinion substantially curtails the reach of Chalue, but it is for the Supreme Judicial Court to revisit or 

 Page 459 

limit Chalue. Until then, if either Chalue or preserved error are to retain any meaning, this conviction should be vacated. Accordingly, I dissent.

FOOTNOTES
[Note 1] This case was initially heard by a panel comprised of Chief Justice Green and Justices Sullivan and Henry. After circulation of a majority and dissenting opinion to the other justices of the Appeals Court, the panel was expanded to include Justices Vuono and Meade. See Sciaba Constr. Corp. v. Boston, 35 Mass. App. Ct. 181, 181 n.2 (1993). 

[Note 2] He was also convicted of possession of a firearm without a license, G. L. c. 269, § 10 (a), and unlawful possession of a loaded firearm, G. L. c. 269, § 10 (n). These convictions are not at issue on appeal. 

[Note 3] We use the epithet in full once for clarity, and to ensure that the topic is searchable in legal databases. In the balance of this opinion we follow the approach employed in Commonwealth v. Gonsalves, 488 Mass. 827, 830 (2022). 

[Note 4] When Alvarado spoke to the police, he did not tell them that he saw the defendant in the car with a gun. He did say, however, that the defendant had a "dark object" in his hands when he got out of the car, and that when the defendant turned Alvarado recognized the object as a gun. He also said that his view of the exchange between Cartie and the defendant was blocked. 

[Note 5] She did not see the shooting but called 911 as soon as she heard it and remained at the scene, but left before speaking with the police. A group of Western New England University School of Law students were also nearby. They stopped, and one cleared Cartie's airway of blood and rendered first aid until an ambulance arrived. He likewise did not see the shooting. 

[Note 6] Because the defendant, Michael Rodriguez, and the witness, Jose Rodriguez, share the same last name, we refer to the witness as "Rodriguez" and to the defendant as "the defendant" throughout this opinion. 

[Note 7] The judge gave a contemporaneous prior bad acts instruction. 

[Note 8] Rodriguez originally placed the conversations in 2015, but amended his statement to the police when it was pointed out to him that the defendant was in jail by that time. 

[Note 9] Defense counsel sought to impeach Rodriguez's testimony by admitting several criminal convictions, eliciting evidence that he was a daily user of cocaine at the time of his conversations with the defendant, and that he received a favorable plea disposition and relocation expenses in exchange for his testimony. 

[Note 10] The defendant also objected more broadly to Rodriguez's testimony and to evidence that the defendant was a drug dealer, but the defendant's pretrial motion in limine objecting to the testimony was denied on the grounds that the evidence showed the relationship between the parties and made it more likely that the defendant would have confided in Rodriguez. See Gonsalves, 488 Mass. at 836-837. On appeal, the defendant has focused solely on the racial epithet and has not argued the broader issues. 

[Note 11] We note that the present case was tried approximately four years before Chalue was decided. 

[Note 12] Because we view the case as distinguishable from Chalue for the reasons we have explained, we respectfully disagree with the suggestion by our dissenting colleagues that this case unjustifiably reaches a different result. 

[Note 13] We acknowledge, however, that the error was unpreserved in Chalue. 

[Note 14] The judge instructed: 

"If the Commonwealth proved the defendant did not act in proper self-defense solely because the defendant used more force than was reasonably necessary, then the Commonwealth has not proved that the defendant committed the crime of murder. But if the defendant [sic] has proved the other required elements, you shall find the defendant guilty of murder."

[Note Dissent-1] See also Commonwealth v. Rosa, 468 Mass. 231, 241 (2014), and Commonwealth v. Bishop, 461 Mass. 586, 596 (2012). 

[Note Dissent-2] On direct examination, the term was translated as "n--." On cross-examination the witness confirmed that he had said "negro sucio" in Spanish, and confirmed the translation as "dirty n[--]." It was for the jury to infer if the term "dirty n[--]" was used by the witness or the defendant. It is not clear on a cold transcript. 

[Note Dissent-3] The notion of working around irrelevant, racially charged evidence has been endorsed by the Supreme Judicial Court. In Chalue, for example, the court encouraged judges to consider allowing reference to "a secret type of prison organization" instead of expressly referencing the Aryan Brotherhood by name. Chalue, 486 Mass. at 868 n.22. The court noted that "[a] judge seeking to blunt the prejudicial effect of this type of group membership evidence may also consider allowing reference to 'a secret type of prison organization' instead of the more specific term 'Aryan Brotherhood.'" Id. Such a substitution "may have been able to achieve the same of effect of explaining why the defendant confided in [fellow inmates] while avoiding other prejudicial associations of the Aryan Brotherhood." Id. Similarly here, identifying the race of the soldier as Black would have accomplished the intended purpose of demonstrating that the defendant admitted to the shooting, minus the prejudicial effect. 

[Note Dissent-4] The Commonwealth relies on Rosa, and so that case is addressed here for completeness. In Rosa, the court recognized that admission of jailhouse telephone recordings in which the defendant repeatedly used the word "n--" or "niggah" could be prejudicial, but determined that the evidence was not unduly prejudicial because the defendant's use of the language was so constant that it became evident that he was using the term not as a racial epithet, but as a term of familiarity, like "guy." Rosa, 468 Mass. at 241. In this case, there is no indication that the defendant used the term in that way -- there is no reference to it in the testimony of the other witnesses. The defendant does not use the word in the transcripts of recorded jailhouse conversations. Moreover, the prosecution (and the defense) treated the word not as a colloquial term of familiarity but as a racial epithet at trial and on appeal. 

[Note Dissent-5] Cartie's brother did not tell police he saw the defendant in the car with a gun, but at trial claimed to have seen the defendant flash and cock a gun from inside the car. The Commonwealth relied on this evidence to argue premeditation, a theory that the jury rejected. 

[Note Dissent-6] Both the disinterested witness and the defendant's former girlfriend said that her car was blocked by other cars at the front and rear at a red light. 

[Note Dissent-7] The recorded conversations contained no such threat. 

[Note Dissent-8] As a result of his cooperation in this case, Rodriguez was offered a plea involving six months' incarceration, as opposed to the one-year offer previously made by the prosecution, to resolve pending charges. He pleaded guilty and had served the additional six months by the time of trial. The Commonwealth also gave Rodriguez an airline ticket and $300 in relocation expenses. 

[Note Dissent-9] By contrast, in Chalue, 486 Mass. at 885, where the conviction was affirmed, the statement was attributed to a codefendant, the error was unpreserved and reviewed for a substantial risk of a miscarriage of justice, and the evidence was overwhelming. Here, the statement was directly attributed to the defendant himself, the case turned almost exclusively on questions of credibility, and the issue was fully preserved. 

[Note Dissent-10] This case differs from Chalue, 486 Mass. at 884-885, in that the prosecutor did not explicitly argue the racial epithet in her opening statement or closing argument. While it is true that opening statements or closing arguments may exacerbate improper testimony, see id., "[t]he mere fact that the effect of the statement was not augmented by repetition over the course of the trial says nothing about its initial impact on the jury." Commonwealth v. Montanino, 409 Mass. 500, 506-507 n.4 (1991). The theme of Rodriguez's testimony paralleled the prosecutor's closing argument -- that the defendant was a violent and dangerous person who shot Cartie for no reason and was prepared to have his former girlfriend executed to cover up his crime. In that context, the use of the racial epithet did not require further repetition to hit its mark. 

 
 Home/Search 
 Table of Cases by Citation
 Table of Cases by Name 
 

 Commonwealth of Massachusetts. Trial Court Law Libraries. Questions about legal information? Contact Reference Librarians.